[No. H029974. Sixth Dist. Nov. 5, 2007.]

LONG TRUONG et al., Plaintiffs and Appellants, v.
CU VAN NGUYEN et al., Defendants and Respondents.

868

**COUNSEL**

James J. Der, Jr., Plaintiffs and for Appellants.

Finwall Law Offices and Gordon J. Finwall for Defendants and Respondents.

**OPINION**

**McADAMS, J.**—In this appeal, we address the question whether the doctrine of primary assumption of risk bars a claim for the wrongful death of a *passenger* who tragically died as a result of a collision between the personal watercraft she was riding and another similar watercraft owned and operated by defendants. We are further invited to distinguish existing authority applying the doctrine to the use of personal watercraft by differentiating between "casual" use of such watercraft and "extreme" use. We conclude the doctrine applies to the claims of passengers on personal watercraft. We also decline appellants' invitation to distinguish between casual and extreme use of the watercraft and to draw distinctions based on the use or action at the specific moment of injury without considering the general nature of the activity in which the participants are engaged and the relationship of the plaintiff and the defendant to the activity.

INTRODUCTION

Appellants Long Truong and Yen Truong (hereafter jointly Plaintiffs), parents of decedent Rachael Truong (Rachael), sued respondents Cu Van

Nguyen (Cu Van) and Chuong Nguyen (Chuong; hereafter jointly Defendants) and Anthony Nguyen (Anthony)[1] for wrongful death after Rachael was killed in a collision between two personal watercraft on Coyote Lake. Plaintiffs allege that Cu Van was negligent and negligent per se in the operation of the personal watercraft, that Chuong negligently entrusted the personal watercraft to Cu Van, and that their negligence caused Rachael's death.

The trial court granted Defendants' motion for summary judgment. The court held that Plaintiffs' wrongful death, survivorship, negligence, and negligence per se claims against Cu Van were barred by the primary assumption of risk doctrine and that Plaintiffs' survivorship and negligent entrustment claims against Chuong were barred because there was no evidence of negligent entrustment.

Plaintiffs appeal, contending that the trial court erred in granting summary judgment because the primary assumption of risk doctrine does not apply in this case because Rachael was a passenger on the personal watercraft and was not engaged in an active sporting activity at the time of the accident. Plaintiffs urge us to distinguish between "ordinary" or "casual" use of the personal watercraft and "extreme" use such as competitions or racing and argue that the doctrine should not apply to the casual use in this case. They contend Anthony's declaration that there are no skills required to be a passenger on a sitdown personal watercraft raises a triable issue sufficient to defeat summary judgment. We conclude the court properly granted summary judgment of the claims against Cu Van because the doctrine of primary assumption of risk applies and is a complete defense. We also affirm the trial court's grant of summary judgment of the negligent entrustment claim against Chuong.

FACTS

This is a wrongful death action arising out of the collision of two personal watercraft on Coyote Lake in Gilroy, California. The operation of personal watercraft, along with other water activities, is permitted on the lake. On the day of the accident, the lake had posted a 35 mph speed limit and a counterclockwise traffic pattern. There was a single boat launch ramp on the west side of the lake. At the time of the accident, there were 30 to 35 vessels

---

[1] Defendant Anthony Nguyen is not a party to this appeal and is no relation to Cu Van Nguyen and Chuong Nguyen. For ease of reference and not out of disrespect, we shall hereafter refer to the parties by their first names. We note also that Plaintiffs' decedent's name is spelled both "Rachel" and "Rachael" in the record. We shall use "Rachael" since it is used in the pleadings. Likewise, defendant Chuong's named is spelled both as "Chuong" and "Chong." We adopt the former spelling for this opinion.

on the water, which was considered to be moderate activity. The weather was fair and visibility was good. There was a moderate wind, which made the lake a bit choppy.

On the afternoon of June 1, 2003, Anthony, Rachael and friends gathered at a Coyote Lake picnic area. Anthony owned a 1995 Polaris SLX personal watercraft (Polaris), which can carry a driver and one passenger,[2] both in seated positions. Anthony and Rachael went for a ride on the Polaris. At the time of the incident, Anthony was operating the Polaris, and Rachael was sitting in front of him, as a passenger.

That same afternoon, Cu Van, Chuong, their family members and their friends were at Coyote Lake to operate personal watercraft. Chuong, the son of Cu Van, owned two personal watercraft, including the 2003 Yamaha WaveRunner GP1300R (Yamaha) that was involved in the accident. The Yamaha, like the Polaris, can carry two people (a driver and a passenger), both in seated positions. The Yamaha driver operates it from a sitting position and controls speed through a trigger throttle lever on the right handle bar. The Yamaha has a "visibility spout" that generates a 10-foot spray of water to make it more visible to others in the area of operation.

Chuong taught Cu Van how to operate personal watercraft in 2001 and Cu Van had experience operating such vessels prior to the incident. On the date of the accident, Cu Van was not aware of any mechanical defects with the Yamaha; both the speedometer and the visibility spout were working. Cu Van did not ingest any alcohol or drugs and did not have any health problems on the date of the incident.

Cu Van felt very comfortable operating both of Chuong's personal watercraft on June 1, 2003. He went out on the personal watercraft four or five times that day. Each session lasted no longer than 15 minutes since operating personal watercraft requires physical exertion and is tiring. At the time of the accident, Cu Van was operating the Yamaha and was alone on the craft.

Around 4:00 p.m., the Yamaha and the Polaris collided near the middle of Coyote Lake, resulting in the death of Rachael, along with injury to Anthony and property damage to both watercraft. At the time of the collision, Cu Van was traveling about 25 mph and following the posted traffic pattern; Anthony and Rachael were traveling five to 10 miles per hour. Anthony followed the traffic pattern around the lake, then cut across the lake to circle back to the

---

[2] Plaintiff asks us to take judicial notice, based on certain Internet sources, of the fact that the Polaris is a two-seater. However, the undisputed evidence, which included the declaration of Anthony and photographs of the vessel, was that the Polaris in this case carried two riders. Thus, there is no need for us to take judicial notice of this fact and the request is denied.

point where he had started. Cu Van claims Anthony violated the posted traffic pattern. According to the ranger's report, Rachael was injured when the Yamaha rode up over the starboard stern of the Polaris and impacted her torso, forcing her into the steering column.

PROCEDURAL HISTORY

## I. *Pleadings*

The operative pleading is Plaintiffs' first amended complaint (complaint). Plaintiffs named Cu Van, Chuong, and Anthony as defendants.[3] The complaint contains causes of action for wrongful death on a negligence theory against Cu Van, survivorship[4] against all three defendants, negligence and negligence per se[5] against Cu Van, negligence per se against Anthony, and negligent entrustment against Chuong.

## II. *Motion for Summary Judgment*

On July 29, 2005, Defendants moved for summary judgment of all the claims against them. Defendants' motion was based on the affirmative

---

[3] The disposition of this matter with regard to Anthony is not clear from the record. According to Defendants' papers below, Plaintiffs obtained Anthony's default. According to Plaintiffs' opening brief, Anthony made an appearance. On our own motion, we have taken judicial notice of the superior court's public record docket entries, which indicate that after summary judgment was granted to Defendants, Plaintiffs attempted to take Anthony's default. Default was not entered and Anthony filed an answer. As noted previously, Anthony is not a party to this appeal and questions related to Anthony's duty and potential liability are not before us.

[4] The first cause of action, entitled "Wrongful Death" is based on the alleged negligence of Cu Van in operating the Yamaha. It is therefore duplicative of the third cause of action against Cu Van for negligence. The second cause of action entitled "Survivorship" alleges merely that the "acts and omissions of the Defendants, and each of them, were the direct legal causes of the injuries and death of Plaintiffs' Decedent" and claims survivorship damages. It does not plead any specific theory of liability and is therefore duplicative of the other causes of action in the complaint.

[5] The negligence per se causes of action were based on Harbors and Navigation Code section 655, subdivision (a) and California Code of Regulations, title 14, section 6600.1, rules 5 and 8.

Section 655, subdivision (a) of the Harbors and Navigation Code provides: "No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb, or property of any person. The department shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the purpose for which it was designed." While the ranger who investigated this accident cited Cu Van for violating section 655, subdivision (a) at the scene, he later recommended the citation be dismissed.

California Code of Regulations, title 14, section 6600.1 adopts specified rules of the road and pilot rules promulgated by the United States Coast Guard. Rule 5 requires every vessel to maintain a proper lookout and rule 8 outlines action that should be taken to avoid collision.

defense of primary assumption of risk. Citing *Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566 [2 Cal.Rptr.3d 883] (*Whelihan*) (primary assumption of the risk applies to use of jet skis) and *Peart v. Ferro* (2004) 119 Cal.App.4th 60 [13 Cal.Rptr.3d 885] (*Peart*) (primary assumption of the risk applies to cases involving personal watercraft), Defendants asserted that the doctrine of primary assumption of risk applies to the recreational activity of riding personal watercraft and is a complete bar to the causes of action in Plaintiffs' complaint. They argued that the risk of collision with another personal watercraft is inherent in the activity of using personal watercraft and that Plaintiffs' decedent assumed that risk. Moreover, Defendants claimed that there were no triable issues of material fact that their conduct was intentional or so reckless as to be outside the range of ordinary activity involved in operating a personal watercraft, and that they owed no duty to protect Rachael from risks inherent in the activity. Defendants argued that the Harbors and Navigations Code section and the regulations Plaintiffs relied on as the basis for their negligence per se claims did not trump the common law primary assumption of the risk doctrine. Finally, Defendants contended that in addition to the "insurmountable hurdle of Cu Van . . . having no duty" to Rachael, there was no evidence Chuong negligently entrusted the Yamaha to Cu Van. Defendants did not move for summary adjudication in the alternative.

Plaintiffs opposed the motion. Citing *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 801 [112 Cal.Rptr.2d 217] (*Shannon*), which held that the primary assumption of the risk doctrine does not apply "where a driver of a boat takes passengers out on [the] boat for a simple ride around a lake," Plaintiffs argued that the primary assumption of risk doctrine does not apply to this case because Rachael was not engaged in a covered sporting activity since she was merely a passenger on the Polaris and Anthony had taken her out for a simple ride around the lake. Plaintiffs also argued that *Defendants* were not engaged in an activity covered by the doctrine. Plaintiffs stated that, although a personal watercraft may be used for sporting purposes, the situation here was distinguishable because the watercraft were not being used for sport, but instead for casual rides around the lake. They argued that *Whelihan* and *Peart* were distinguishable because the parties in both cases operated their watercraft at relatively high speeds and engaged in maneuvers and did not just use the watercraft as a means of transportation, as was the case here. They asserted that, because of this distinction in use, Defendants breached their ordinary duty of care to Rachael, were negligent, and are liable for her death.

Plaintiffs did not address Defendants' arguments regarding the negligence per se and negligent entrustment causes of action on the merits. They argued instead that Defendants were not entitled to summary adjudication of those causes of action because they had not requested summary adjudication in the alternative.

Defendants filed a reply in which they argued that the activity at issue here was identical to that in *Peart* and that there was no difference between the jet ski in *Whelihan* and the personal watercraft in this case. They also contended that the question of whether Rachael was the operator or a passenger of the vessel is not pertinent to the analysis and that operating a personal watercraft is not a benign activity like riding in a boat, the activity at issue in *Shannon*.

### III. *Order on Motion for Summary Judgment*

The court granted the motion for summary judgment. The court found that as a matter of law, the doctrine of primary assumption of risk applied and provided a complete defense to the negligence and negligence per se causes of action against Cu Van. The court explained that Rachael, as a passenger, was a participant in the sporting activity of riding a personal watercraft and therefore assumed the risks inherent in the activity. The court found further that Plaintiffs had not alleged that Defendants acted in a manner that increased Rachael's risk of injury above and beyond that inherent in the sport. The court held that the negligence per se claims against Cu Van were also barred by the primary assumption of risk doctrine.

The court found that Chuong had satisfied his burden of proving that Plaintiffs could not show that Chuong had negligently entrusted the Yamaha to Cu Van and that Plaintiffs had failed to raise a triable issue of material fact with regard to the negligent entrustment claim.

### DISCUSSION

### I. *Standard of Review*

We review an order granting summary judgment de novo, considering all the evidence set forth in the moving and opposition papers, except that to which objections have been made and sustained. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) In undertaking our independent review of the present case, we apply the same three-step analysis used by the trial court. First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact. (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886–887 [41 Cal.Rptr.2d 740].)

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To be granted summary judgment, a defendant must show that one of the required elements of the plaintiff's case cannot be established, or that there is "an affirmative defense to that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(2).) To show a complete defense, the defendant must present admissible evidence of each essential element of the defense upon which it bears the burden of proof at trial. (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289 [85 Cal.Rptr.2d 331].) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a genuine issue of material fact exists as to that cause of action, element, or defense. (Code Civ. Proc., § 437c, subd. (*o*)(2).) There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar, supra*, 25 Cal.4th at p. 845.)

In this case, Defendants argue that they are entitled to summary judgment based on the affirmative defense of primary assumption of risk. Thus, they have the burden of showing every element necessary to the application of the defense. We note, moreover, that if the defense applies to the facts of this case, it relieves Defendants of any duty to Plaintiffs, effectively showing that the element of duty, necessary to any cause of action for negligence, cannot be established.

■ Chuong argues that he is entitled to summary judgment because Plaintiffs cannot meet their burden of proving negligent entrustment. "Liability for negligent entrustment is determined by applying general principles of negligence, and ordinarily it is for the jury to determine whether the owner has exercised the required degree of care . . . ." (*Allen v. Toledo* (1980) 109 Cal.App.3d 415, 421 [167 Cal.Rptr. 270], citations omitted.) " 'The elements of a cause of action for negligence are well established. ■ They are "(a) a *legal duty* to use due care; (b) a *breach* of such legal duty; [and] (c) the breach as the *proximate or legal cause* of the resulting injury." ' " (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [50 Cal.Rptr.2d 309, 911 P.2d 496].) In short, to recover on a theory of negligence, Plaintiffs must prove duty, breach, causation, and damages. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 489 [50 Cal.Rptr.2d 785].) Although he does not specifically tell us so, Chuong's summary judgment is based on the theory that Plaintiffs cannot prove a breach of duty with regard to their negligent entrustment claim.

In ruling on a motion for summary judgment, we must consider the evidence and inferences reasonably drawn from the evidence in the light most favorable to the party opposing the motion. (*Aguilar, supra*, 25 Cal.4th at

p. 843.) In performing our independent review, we view the evidence in a light favorable to the losing party (Plaintiffs), liberally construing their evidentiary submission while strictly scrutinizing the moving party's (Defendants') own showing and resolve any evidentiary doubts or ambiguities in the losing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

## II. *General Rules Related to the Primary Assumption of Risk Doctrine*

The California Supreme Court examined the doctrine of assumption of risk in the seminal cases of *Knight v. Jewett* (1992) 3 Cal.4th 296, 305–315 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] (*Ford*). Our state Supreme Court recently revisited the doctrine in *Shin v. Ahn* (2007) 42 Cal.4th 482 [64 Cal.Rptr.3d 803, 165 P.3d 581] (*Shin*) and examined the question "whether the primary assumption of risk doctrine should apply to noncontact sports, such as golf." (*Id.* at p. 486.)

In *Shin*, the court explained: "Generally, one owes a duty of ordinary care not to cause an unreasonable risk of harm to others. (Civ. Code, § 1714, subd. (a); *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561].) The existence of a duty is not an immutable fact of nature, but rather an expression of policy considerations providing legal protection. [Citation.] Thus, the existence and scope of a defendant's duty is a question for the court's resolution. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 [4 Cal.Rptr.3d 103, 75 P.3d 30] . . . .) When a sports participant is injured, the considerations of policy and duty necessarily become intertwined with the question of whether the injured person can be said to have assumed the risk. [Citation.] [¶] California's abandonment of the doctrine of contributory negligence in favor of comparative negligence (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226] . . .) led [the California Supreme Court] to revisit the assumption of risk doctrine in *Knight, supra*, 3 Cal.4th 296." (*Shin, supra*, 42 Cal.4th at pp. 488–489.)

The *Shin* court explained, "In *Knight, supra*, 3 Cal.4th 296, the plurality noted that there are two types of assumption of risk: primary and secondary. (*Id.* at pp. 308–309 . . . .) Under the primary assumption of risk doctrine, the defendant owes *no duty* to protect a plaintiff from particular harms arising from ordinary, or simple negligence. (*Ibid.*) In a sports context, the doctrine bars liability because the plaintiff is said to have assumed the particular risks inherent in a sport by choosing to participate. (*Id.* at pp. 315–316.) Thus, 'a court need not ask what risks a particular plaintiff subjectively knew of and chose to encounter, but instead must evaluate the fundamental nature of the sport and the defendant's role in or relationship to

that sport in order to determine whether the defendant owes a duty to protect a plaintiff from the particular risk of harm. ([*Knight, supra*, 3 Cal.4th] at pp. 313, 315–317.)' " (*Shin, supra*, 42 Cal.4th at p. 489.)

"The *Knight* court used baseball as an example. In baseball, a batter is not supposed to carelessly throw the bat after getting a hit and starting to run to first base. However, the primary assumption of risk doctrine recognizes that vigorous bat deployment is an integral part of the sport and a risk players assume when they choose to participate. Especially in the heat of competition, and in an effort to get to first base quickly, a batter may be careless in freeing himself or herself from the bat's encumbrance. Thus, under the doctrine, a batter does not have a duty to another player to avoid carelessly throwing the bat after getting a hit." (*Shin, supra*, 42 Cal.4th at p. 489.)

In *Knight*, the court "stressed the chilling effect that would flow from imposing liability on touch football players for ordinary careless conduct. '[E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of legal liability for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity . . . .' [Citation.] Accordingly, [the court] concluded that coparticipants' limited duty of care is to refrain from intentionally injuring one another or engaging in conduct that is 'so reckless as to be totally outside the range of the ordinary activity involved in the sport.' " (*Shin, supra*, 42 Cal.4th at pp. 489–490, quoting *Knight, supra*, 3 Cal.4th at p. 320, fn. omitted.)

" '[T]he question whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport.' " (*Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at p. 1004 (*Kahn*).) " '[I]n the sports setting . . . conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself.' " (*Id.* at p. 1004, quoting *Knight, supra*, 3 Cal.4th at p. 315.) "[A]s a matter of policy, it would not be appropriate to recognize a duty of care when to do so would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events. Accordingly, defendants generally do not have a duty to protect the plaintiff from the risks inherent in the sport, or to eliminate risk from the sport, although they generally do have a duty not to increase the risk of harm beyond what is inherent in the sport." (*Kahn*, at p. 1004, citing *Knight, supra*, at pp. 315–316.)

In *Shin*, the court held that the primary assumption of the risk doctrine applies to golf and that being struck by a carelessly hit ball is an

inherent risk of the sport. (*Shin, supra*, 42 Cal.4th at pp. 486, 497.) The court summarized the applicable rule, stating: "In *Knight* . . . , we considered the duty of care that should govern the liability of sports participants. We recognized that careless conduct by coparticipants is an inherent risk in many sports, and that holding participants liable for resulting injuries would discourage vigorous competition. Accordingly, those involved in a sporting activity do not have a duty to reduce the risk of harm that is inherent in the sport itself. They do, however, have a duty not to increase that inherent risk. [Citation.] Thus, sports participants have a limited duty of care to their coparticipants, breached only if they intentionally injure them or 'engage[] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.' (*Knight*, [*supra*, 3 Cal.4th] at p. 320, fn. omitted.) This application of the *primary assumption of risk doctrine* recognizes that by choosing to participate, individuals assume that level of risk inherent in the sport." (*Id.* at p. 486.)

■ In secondary assumption of the risk cases, the issue is resolved by applying the doctrine of comparative fault and the plaintiff's decision to face the risk would not operate as a complete bar to recovery. In such cases, the plaintiff's knowing and voluntary acceptance of the risk functions as a form of comparative negligence. (*Kahn, supra*, 31 Cal.4th at p. 1003, citing *Knight, supra*, 3 Cal.4th at pp. 308, 310–311.)

■ The question of " 'the existence and scope' " of the defendant's duty is one of law to be decided by the court, not by a jury, and therefore cases involving a primary assumption of risk defense are generally " 'amenable to resolution by summary judgment.' " (*Kahn, supra*, 31 Cal.4th at p. 1004, quoting *Knight, supra*, 3 Cal.4th at p. 313.)

Since the decision in *Knight*, which involved a recreational game of touch football, our state Supreme Court and appellate courts have examined the applicability of the primary assumption of the risk defense in a wide variety of cases involving sports and recreational activities. In *Ford, supra*, 3 Cal.App.4th 339, the companion case to *Knight*, the Supreme Court expanded the doctrine and applied it to the noncompetitive, nonteam sporting activity of waterskiing. The Supreme Court has applied the doctrine to other sports, including intercollegiate baseball (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161 [41 Cal.Rptr.3d 299, 131 P.3d 383]), swimming (*Kahn, supra*, 31 Cal.4th at pp. 1004–1005 [examining coach's relationship to sport]), and snow skiing (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067–1068 [68 Cal.Rptr.2d 859, 946 P.2d 817] (*Cheong*)). (*Shin, supra*, 42 Cal.4th at p. 490.) The Courts of Appeal have applied the primary assumption of the risk rule in cases involving snow skiing (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855]), "off-roading" with a motorcycle or "dune buggy" (*Distefano v. Forester* (2001) 85

Cal.App.4th 1249, 1255, 1259–1265 [102 Cal.Rptr.2d 813]), skateboarding (*Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 115–117 [96 Cal.Rptr.2d 394]), figure ice skating (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632–1636 [53 Cal.Rptr.2d 657]), and long-distance group bicycle riding (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1218–1223 [130 Cal.Rptr.2d 198]), to name a few.

In addition to *Ford*, cases that have applied the doctrine to water sports or boating include: *Stimson v. Carlson* (1992) 11 Cal.App.4th 1201, 1205 [14 Cal.Rptr.2d 670] (applying primary assumption of risk to sailboating where the plaintiff was one of the crew operating the boat and recognizing that sailing involves swinging booms and physical participation of crew); *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 256 [38 Cal.Rptr.2d 65] (doctrine applies to river rafting; "It is the thrill of challenging nature and running the rapids without mishap [that] sets it apart from, for example, a trip down the giant slide at Waterworld"); *Mosca v. Lichtenwalter* (1997) 58 Cal.App.4th 551, 553 [68 Cal.Rptr.2d 58] (applying doctrine to sportfishing after noting "[h]ooking and catching fish require a great deal of knowledge, physical skill, and attention"); *Record v. Reason* (1999) 73 Cal.App.4th 472, 475, 482 [86 Cal.Rptr.2d 547] (*Record*) ("tubing" behind a motorboat); *Bjork v. Mason* (2000) 77 Cal.App.4th 544, 550 [92 Cal.Rptr.2d 49] (although "tubing" behind a motorboat is covered by the doctrine, the act of providing the equipment for tubing is not); *Whelihan, supra,* 110 Cal.App.4th 1566 (doctrine applies to jet skiing) and *Peart, supra,* 119 Cal.App.4th 60 (doctrine applies to riding personal watercraft). On the other hand, the court in *Shannon, supra,* 92 Cal.App.4th at page 801, held that primary assumption of risk does not apply "where a driver of a boat takes passengers out on the boat for a simple ride around a lake" and one of the passengers is injured.

III. *Application of the Primary Assumption of Risk Doctrine to a Passenger on a Personal Watercraft (Negligence Claim Against Cu Van)*

Plaintiffs attempt to distinguish this case from *Whelihan* and *Peart* and urge this court to apply the holding from *Shannon*, arguing that the primary assumption of the risk doctrine does not apply because Rachael was just a passenger on the Polaris. Plaintiffs assert the court should look at the activity at the time of the accident and not rely on an overly simplistic generalization of the activity. Plaintiffs distinguish between "ordinary" or "casual" use of the personal watercraft and "extreme" use like professional exhibitions or racing, and argue that the doctrine should not apply to the casual use in this case. They contend that Anthony's declaration that there are no skills required to be a passenger on a WaveRunner raises a triable issue sufficient to defeat summary judgment.

As noted previously, in determining whether the primary assumption of risk doctrine applies, we examine the nature of the activity or sport in which the defendant was engaged and the relationship of the defendant and the plaintiff to that activity or sport. (*Kahn, supra,* 31 Cal.4th at pp. 1003–1004.)

### A.   Standard for Determining Whether an Activity Is a Sport for Purposes of the Assumption of Risk Doctrine

■■■■  In *Record, supra,* 73 Cal.App.4th 472, the court considered the issue of whether a particular activity was a "sport" for the purpose of applying the assumption of risk doctrine. After examining the case law applying primary assumption of risk to a variety of activities, the court stated that "[c]ompiling all of the distinguishing factors, it appears that an activity falls within the meaning of 'sport' if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Id.* at p. 482.) The court observed that holding on to a tube while being pulled behind a boat involved "[c]ombating centrifugal force with a white-knuckled grip" and therefore fell within the meaning of "sport." (*Ibid.*) The court in *Shannon, supra,* 92 Cal.App.4th at page 797 adopted the test from *Record* and stated "[O]ur review of *Knight* and subsequent cases leads us to conclude 'sport' as intended by the *Knight* court necessarily entails some pitting of physical prowess (be it strength based [i.e., weight lifting], or skill based, [i.e., golf]) against another competitor or against some venue."

### B.   Whelihan

In *Whelihan,* the plaintiff and the defendant went jet skiing together at Lake Engelbright. "Consistent with [the defendant's] description of the essence of the sport, [the] defendant drove his jet ski at a 'relatively high rate of speed' while making turns and maneuvers in 'relatively close proximity' to [the] plaintiff's jet ski. The jet skis collided when [the] plaintiff made a left turn in front of [the] defendant." (*Whelihan, supra,* 110 Cal.App.4th at p. 1570.) The trial court granted the defendant's motion for summary judgment of the plaintiff's negligence and negligent infliction of emotional distress causes of action on the ground that they were barred by the primary assumption of risk doctrine. (*Id.* at p. 1571.)

The Court of Appeal affirmed. Applying the test from *Record,* the court concluded that jet skiing is "the type of sporting activity that meets the criteria governing application of the doctrine of primary assumption of risk." (*Whelihan, supra,* 110 Cal.App.4th at p. 1573.) The court explained: "As a matter of common knowledge, jet skiing is an active sport involving physical skill and challenges that pose a significant risk of injury, particularly when it

is done—as it often is—together with other jet skiers in order to add to the exhilaration of the sport by racing, jumping the wakes of the other jet skis or nearby boats, or in other respects making the sporting activity more challenging and entertaining." (*Ibid.*, fn. omitted.) In response to the plaintiff's complaint that the trial court erroneously assumed " 'that the litigants were contestants in some sort of consensual competition event and/or spectator sport,' " the court noted that "the doctrine applies equally to competitive and noncompetitive but active sports." (*Ibid.*, citing *Knight, supra*, 3 Cal.4th at pp. 320–321 & *Ford, supra*, 3 Cal.4th at p. 345.)

Plaintiffs urge us not to follow *Whelihan* "because it is premised on fallacious reasoning." They contend there was no authority or evidence that supported the court's conclusion regarding the nature of the sport. Based on the passage cited above, there was evidence before the *Whelihan* court in which the defendant described "the essence of the sport" and the manner in which both the plaintiff and the defendant operated their jet skis on the date of the accident, which included high speeds and making turns and maneuvers in close proximity to one another. (*Whelihan, supra*, 110 Cal.App.4th at p. 1570.) Thus, there was evidentiary support for the court's conclusions. The court also cited Harbors and Navigation Code sections 655, subdivision (a) and 655.7, subdivision (c).[6] The latter section sets forth examples of maneuvers on personal watercraft that "unreasonably or unnecessarily endanger life, limb, or property." (§ 655.7, subd. (c).)

## C. *Plaintiffs' Request for Judicial Notice*

Plaintiffs challenge the *Whelihan* court's "common knowledge" assumption that jet skiing poses a "significant risk of injury." (*Whelihan, supra*, 110 Cal.App.4th at p. 1573.) Citing a 1998 safety study by the National Transportation Safety Board (NTSB)[7] and a magazine article from Personal Watercraft

---

[6] All further statutory references are to the Harbors and Navigation Code. Section 655, subdivision (a) provides: "No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb, or property of any person. The department shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the purpose for which it was designed." Section 655.7, subdivision (c) provides: "Every personal watercraft shall, at all times, be operated in a reasonable and prudent manner. Maneuvers that unreasonably or unnecessarily endanger life, limb, or property, including, but not limited to, jumping or attempting to jump the wake of another vessel within 100 feet of that other vessel, operating the personal watercraft toward any person or vessel in the water and turning sharply at close range so as to spray the vessel or person, or operating at a rate of speed and proximity to another vessel so that either operator is required to swerve at the last minute to avoid collision, is unsafe or reckless operation of a vessel."

[7] National Transportation Safety Board, Safety Study: Personal Watercraft Safety (1998).

Illustrated Online,[8] Plaintiffs argue that the conclusion that personal watercraft pose a significant risk of injury is false. In another part of their brief, Plaintiffs cite a report by the Personal Watercraft Industry Association (PWIA)[9] and model legislation promulgated by the association.[10] Four days before oral argument, Plaintiffs filed a formal request, asking us to judicially notice these materials. We shall deny the request for judicial notice of these materials[11] for the reasons that follow.

■ First, none of these materials were presented to the court below. Generally, documents and facts that were not presented to the trial court and which are not part of the record on appeal, cannot be considered on appeal. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 [227 Cal.Rptr. 491].) We also disregard statements in the briefs that are based on such improper matter. (*Ibid.*; *Kendall v. Barker* (1988) 197 Cal.App.3d 619, 625 [243 Cal.Rptr. 42].) Second, the PWIA report was published after the hearing on the motion for summary judgment. ■ Generally, appellate courts disregard matters that occur after rendition of an appealed judgment. (*In re Marriage of Folb* (1975) 53 Cal.App.3d 862, 877 [126 Cal.Rptr. 306], disapproved on other grounds in *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 749 [131 Cal.Rptr. 873, 552 P.2d 1169].) Third, we are not persuaded that the industry report, the industry's model code, or the magazine article are properly judicially noticeable under either Evidence Code section 452, subdivision (g) ("Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute") or Evidence Code section 452, subdivision (h) ("Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy").

Finally, even if we were to judicially notice the NTSB report, we are not persuaded it compels a different conclusion from that which the court reached in *Whelihan* with regard to the question whether jet skiing presents a significant risk of injury. The vessel at issue in *Whelihan* was a "jet ski."

---

[8] Kelly, *PWC Industry on the Rise* (Sept. 6, 2006) Personal Watercraft Illustrated Online <http://www.watercraft.com/ShowStory.asp?headlineID=3778> (as of Nov. 5, 2007).

[9] Personal Watercraft Industry Association, The History, Evolution, and Profile of Personal Watercraft (2006).

[10] The material on the model code Plaintiffs ask us to judicially notice may be found at <http://www.pwia.org/relations/modellegislation.aspx?&print=y> (as of Nov. 5, 2007).

[11] Plaintiffs have also asked us to judicially notice Indiana Code chapter 14-15-12 (2007) entitled "Regulation of Personal Watercraft," *Davis v. LeCuyer* (Ind.Ct.App. 2006) 849 N.E.2d 750, *Lykins v. Fun Spot Trampolines* (2007) 172 Ohio App.3d 226 [874 N.E.2d 811], and *City of Santa Barbara v. Superior Court (Janeway)* (2007) 41 Cal.4th 747 [62 Cal.Rptr.3d 527, 161 P.3d 1095]. We shall grant the request with regard to this statutory and decisional law. (Evid. Code, §§ 451, subd. (a), 452, subd. (a), 453.)

(*Whelihan, supra,* 110 Cal.App.4th at p. 1570.) "Jet Ski" is a trademarked name for a personal watercraft manufactured by Kawasaki. (American Heritage Dict. of the English Language (4th ed. 2000) <http://www.bartleby.com/61/67/J0036700.html> [as of Nov. 5, 2007]; *California Casualty Ins. Co. v. Northland Ins. Co.* (1996) 48 Cal.App.4th 1682, 1687 [56 Cal.Rptr.2d 434].) The Concise Oxford English Dictionary (11th ed. 2006 rev.) defines it as "a small, jet-propelled vehicle which skims across the surface of water and is ridden in a similar way to a motorcycle." The original Jet Skis were standup models. (*Peart, supra,* 119 Cal.App.4th at p. 65.) Kawasaki now applies the Jet Ski trademark to its three-person sitdown watercraft. (<http://www.kawasaki.com/Products/SubCategory.aspx?id=23> [as of Nov. 5, 2007].) Both the standup models like the original Jet Ski[12] and the sitdown style personal watercraft like the Polaris and the Yamaha are open to the elements; their riders are not protected by a hull or a cabin. Riders of both types of vessels wear flotation devices in the event they fall from the personal watercraft. The parties in *Whelihan* operated their vessels at high speeds in close proximity to one another while executing turns and other maneuvers. In *Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 760 [43 Cal.Rptr.3d 215] (*Polaris*), there was evidence that when a Polaris personal "watercraft is accelerating and encounters a wave, the passenger can 'get some lift' off the seat, and if the passenger is not well coupled to the craft he or she may lose balance and roll off." In that case, the passenger suffered serious internal, orifice injuries after being ejected off the back of the vessel into the stream of water thrust by the jet nozzle. (*Ibid.*) Regardless of the statistics in the NTSB report regarding the frequency of injuries involving personal watercraft, given the nature of the vessel and the manner in which it is used, the *Whelihan* court was correct to conclude that the activity of "jet skiing" presented a significant risk of injury.

### D. Peart

Plaintiffs also argue that this court should not follow *Peart*. *Peart* was a negligence action arising out of the use of two Bombadier brand Sea-Doo personal watercraft. (*Peart, supra,* 119 Cal.App.4th at p. 67, fn. 5.) "A Sea-Doo is similar to a jet ski in its operation, differing only in that it is equipped with a seat similar to that of a motorcycle upon which the operator generally sits rather than stands." (*Id.* at p. 65.) At the time of the accident, 16-year-old Adam Peart and his 13-year-old cousin Jason C. were riding the Sea-Doos. Peart was operating a two-seater Sea-Doo; Jason was operating a three-seater Sea-Doo. (*Id.* at pp. 65, 67, fn. 2.) Since Jason was under 16, he

---

[12] Plaintiffs fault the court in *Whelihan* for using the term "jet ski." However, nothing in the opinion suggests the vessel in that case was anything other than a Jet Ski standup style personal watercraft manufactured by Kawasaki.

had to be accompanied by an adult to operate the Sea-Doo. Paul Ferro, who owned one of the Sea-Doos therefore rode with him, as a passenger. Peart had not operated a Sea-Doo before, but had operated a Jet Ski. Jason had ridden a Sea-Doo before. (*Id.* at p. 66.) Peart drove his Sea-Doo around the lake, accelerating and making turns, while Jason maintained a straight course. After a while, Peart began to cut back and forth across the wake of Jason's Sea-Doo. As Jason maintained a speed of 30 mph, Peart accelerated to 45 to 50 miles per hour, turned directly across the path of Jason's Sea-Doo, and disappeared behind a wall of water. Shortly after he reappeared, the two vessels collided. (*Id.* at pp. 66–67.)

Peart sued Jason and the owners of the Sea-Doos for personal injuries. The defendants moved for summary judgment based on the assumption of risk doctrine. The trial court found that "Sea-Doo riding was a 'sport' within the meaning of that doctrine, because it was an activity akin to water-skiing or inner tubing performed 'for enjoyment or thrill, [that] requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury.' The trial court specifically found that '[t]he existence of obstacles in the environment, such as spraying water, wakes to be crossed and other watercraft to be passed, [were] part of the thrill of the sport,' and that Peart 'was not using the sea-doo merely as a means of transportation.' Noting that [the plaintiffs] had 'offered no evidence that [the defendants'] behavior was intentional or reckless, or increased the risks to [Peart] over and above those *inherent* in the sport,' the trial court concluded that '[c]ollisions between sea-doo riders are such a risk.' " (*Peart, supra,* 119 Cal.App.4th at pp. 68–69.)

The appellate court agreed. The court rejected the plaintiffs' claim that *Whelihan* was wrongly decided and noted that the court in that case had "analyzed both the nature of the specific conditions, conduct or risks involved in jet skiing, and the particular role of the defendant in the activity and in relation to the plaintiff." (*Peart, supra,* 119 Cal.App.4th at p. 73.) The court concluded that *Whelihan* was "clearly on point." (*Id.* at p. 74.) It explained that it was "undisputed that the only significant difference between a jet ski and a Sea-Doo is that instead of having to stand up, as one does on a jet ski, a person using a Sea-Doo can sit down on a 'motorcycle type' seat." (*Ibid.,* fn. omitted.) The court held "there is no legally material difference between the jet skis at issue in *Whelihan* and the Sea-Doos used in this case" and agreed with *Whelihan*'s "analysis of jet skiing as 'an active sport involving physical skill and challenges that pose a significant risk of injury to *participants* in the sport,' a description which applies equally to the recreational activity of *riding* a Sea-Doo." (*Ibid.,* italics added.) The court held, "There is nothing in the record concerning the recreational activity of using Sea-Doos that would distinguish it in any way from other similar activities found by the courts of this state to constitute sports to which the doctrine of primary

assumption of risk is applicable. We conclude that, in the absence of other considerations, the doctrine of primary assumption of risk applies generally to the *recreational activity of using a Sea-Doo*, just as it does to other similar sports such as water-skiing (*Ford* . . . , *supra,* 3 Cal.App.4th at p. 345), 'tubing' behind a motorboat (*Record* . . . , *supra,* 73 Cal.App.4th at pp. 475, 482 . . .), jet skiing (*Whelihan, supra,* 110 Cal.App.4th at pp. 1572–1573), snow skiing (*Cheong, supra,* 16 Cal.4th at p. 1067), 'off-roading' with a motorcycle or 'dune buggy' (*Distefano, supra,* 85 Cal.App.4th at pp. 1255, 1259–1265), skateboarding (*Calhoon v. Lewis*[, *supra,*] 81 Cal.App.4th [at pp.] 115–117 . . .), figure ice skating (*Staten v. Superior Court*[, *supra,*] 45 Cal.App.4th [at pp.] 1632–1636 . . .), river rafting (*Ferrari v. Grand Canyon Dories*[, *supra,*] 32 Cal.App.4th [at pp.] 251, 253 . . .), and long-distance group bicycle riding (*Moser* [*v. Ratinoff*], *supra,* 105 Cal.App.4th at pp. 1218–1223)." (*Peart, supra,* 119 Cal.App.4th at pp. 74–75, italics added, citation omitted.)

In urging this court to reject *Peart*, Plaintiffs attack the "fundamental factual underpinning of the case," arguing that there was no evidence that sitdown personal watercraft are essentially identical to standup personal watercraft. However, Plaintiffs also refer us to footnote 5 of the opinion where the court stated: "In deposition testimony undisputed by appellants, respondent Ferro described stand-up jet skis and sit-down Sea-Doos as almost identical in terms of similarity of engines, and manner of forward propulsion, turning, slowing down and general maneuvering. The only difference mentioned by Ferro—aside from that between standing and sitting—was with regard to what happens when one falls off. In the case of a stand-up watercraft, Ferro stated that 'the engine keeps going, and what happens is the stand-up [watercraft] automatically circles on its own . . . .' When one falls off a sit-down Sea-Doo, on the other hand, the engine stops and the machine 'just sort of sits there in the water' because 'you have a key that is connected to it, or you have a strap that is connected to the key.' " (*Peart, supra,* 119 Cal.App.4th at p. 74, fn. 5.) Thus, there is no merit to Plaintiffs' claim that there was no factual support for the court's conclusions.

### E. Shannon

Plaintiffs urge us to follow the holding in *Shannon*, arguing that Rachael was merely a passenger on the Polaris and was not actively involved in the sport.

In *Shannon*, six-year-old Haley and her siblings went for a ride on Lake Kaweah in defendant Rhodes's ski boat. Haley fell out of the boat and suffered severe injury ("near amputation") to her arm after it came into contact with the boat's propeller. (*Shannon, supra,* 92 Cal.App.4th at p. 794.)

Haley sued the boat owner/driver claiming he had negligently failed to make sure the riders were properly seated before accelerating the boat. (*Ibid.*) The defendant moved for summary judgment based on the primary assumption of risk doctrine. The trial court concluded that the defendant owed no duty to Haley because the doctrine applied. (*Id.* at p. 795.) The appellate court reversed.

On appeal, Haley argued that "a passenger riding in a boat simply is not engaged in the type of activity the *Knight* court intended to reach with the doctrine of primary assumption of risk." (*Shannon, supra,* 92 Cal.App.4th at p. 796.) Applying the definition of "sport" from *Record*, she asserted "that being a passenger in a ski boat involves no challenge nor any potential risk of injury, and that because there is 'no physical exertion' nor skill level involved in merely riding in a ski boat, it is not the type of activity encompassed by *Knight*. [The defendant] counter[ed] that many authorities consider 'noncompetitive recreational activities' to be subject to the doctrine of assumption of risk . . . [and] that even if the *Record* test were appropriate, 'recreational boating arguably fits within its parameters.' " (*Id.* at p. 798, fn. omitted.) The court concluded that being a passenger in a boat under the circumstances in *Shannon* was "too benign to be subject to *Knight*." (*Ibid.*)

The court distinguished other California boating cases. It observed that the court in *Ford* "explicitly used the language 'noncompetitive *but active* sports activity' in applying the doctrine to waterskiing" and that the court focused on the " 'vigorous, athletic activity' " and risk involved in the waterskiing itself to conclude that the activity of waterskiing was a sport and that the boat driver, who " 'operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the . . . sport,' " was a coparticipant in that sport. (*Shannon, supra,* 92 Cal.App.4th at p. 798, quoting *Ford, supra,* 3 Cal.4th at p. 345.) The court concluded that "[t]he same certainly cannot be said of a mere passenger in a boat, particularly when the boat is simply a pleasurable means of transportation." (*Shannon, supra,* at p. 798.) The court also distinguished *Stimson v. Carlson, supra,* 11 Cal.App.4th 1201, reasoning that "the plaintiff was an active crewmember on a sailboat participating in sailing, not a mere passenger" and *Ferrari v. Grand Canyon Dories, supra,* 32 Cal.App.4th 248, because "the plaintiff was part of a river rafting excursion, an activity necessarily involving physical participation of those in the raft in order to navigate the river." (*Shannon, supra,* at p. 799.) The court observed that there were no cases that applied primary assumption of risk to bar the claim of a passenger of a boat whose only participation was being in the boat. (*Ibid.*)

The court also addressed the defendant's contention that recreational boating would be seriously curtailed if the defense was not available to those

engaged in the activity and concluded that imposing a duty of care on the defendant in the circumstances presented in *Shannon* would not have a chilling effect on recreational boating. The court cited the following language from *Ford*: " 'Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports. As a result, holding ski boat drivers liable for their ordinary negligence might well have a generally deleterious effect on the nature of the sport of waterskiing as a whole. Additionally, imposing such liability might well deter friends from voluntarily assisting one another in such potentially risky sports.' " (*Shannon, supra*, 92 Cal.App.4th at p. 800.) In contrast, the court concluded that "even if there were some 'chilling effect' to the extent a ski boat operator drives his boat more cautiously, or, for example, takes extra measures to ensure his passengers are seated properly, that will not change the nature of the activity of 'recreational' boating. There is nothing inherent in the activity of recreational boating that requires the driver to 'throw caution to the wind' . . . to enjoy the activity. . . . It simply cannot be said that the 'nature' of the activity of recreational boating will be altered if boat drivers are required to exercise due care, especially when, as here, they have small children on board. To the contrary, in our view the activity is more likely to be *enhanced* if all boaters are under a duty to not engage in negligent or careless conduct." (*Ibid.*)

The court also stated, "[O]n a commonsense level, we simply cannot conclude that the use of the boat in this case reasonably implicates a 'sport' within any understanding of the word. There is nothing in this record to indicate the boat here was anything more than a mode of transportation. Nothing about the type of boating engaged in here required participation by the passengers, there is nothing competitive or physically challenging about riding in the boat, and it certainly requires no special skill nor physical prowess to do so. Just because the means of the activity (the boat) may at other times be used for sporting purposes does not automatically transform the boat itself into a 'sporting activity.' " (*Shannon, supra*, 92 Cal.App.4th at p. 800.)

> F. *Application of Rule From* Shannon *to Cases Involving Personal Watercraft*

██ Plaintiffs argue that Rachael, like Haley, was merely a passenger on the Polaris and that the assumption of risk doctrine therefore does not apply. We are not persuaded that the activity Rachael engaged in was as benign as that in *Shannon* and conclude, as the court did in *Peart*, that the primary assumption of risk doctrine applies to the activity of riding personal watercraft, regardless of whether the rider is operating the vessel.

As noted previously, in determining whether the primary assumption of risk doctrine applies in a particular case we examine the nature of the activity or sport in which the defendant was engaged and the relationship of the defendant and the plaintiff to that activity or sport.

In addition to the information outlined above about the operation of personal watercraft from *Whelihan, Polaris,* and *Peart,* the following evidence was before the court at the hearing of the motion for summary judgment. According to his declaration, Cu Van considered "operating personal watercraft to be a thrilling, enjoyable and exhilarating experience. They are very maneuverable, quite fast and give the operator a real sense of connection between water and vessel." The evidence included technical information regarding the Yamaha from Yamaha Motor Corporation's Web site. The Web site described the Yamaha WaveRunner GP1300R as "the world's first *musclecraft*" that exceeds federal and California emission standards and "the *most powerful* production two-stroke, watercraft available today featuring the most technologically-advanced engine in its category that is cleaner, quieter and more fuel efficient than anything offered in an *ultimate-performance package* before." (Italics added.) The Yamaha "is designed for people that want *ultra-high-performance*, world-class handling and unequaled reliability. Based on the hull and deck design of the mutli-time IJSBA [International Jet Sports Boating Association] world champion GP1200R, the more powerful GP1300R has no equal. [¶] . . . [¶] The Yamaha WaveRunner GP1300R is the only watercraft today that allows you to enjoy the excitement of an *ultimate-performance ride* in a package that non-users can enjoy because of its cleaner, quieter operation." (Italics added.) Features of the Yamaha included a "high performance" marine engine with electronic fuel injection for "*quick throttle response, maximum acceleration,* and improved fuel efficiency"; "Traction Control: [t]o manage the *awesome power*" of the Yamaha; a jet pump propulsion system that was "[d]esigned to maximize water flow for *high performance*"; a quick shift trim system that allowed for "tighter turns or quicker acceleration on plane, as the rider prefers"; a hull design that is "close to a competition race hull"; and a system that allows the "rider to adjust the turning characteristics of the watercraft to either a positive racing set-up or a more recreational feel." (<http://www.yamaha-motor.com/waverunner/products/modelfeatures/232/0/features.aspx> [as of Nov. 5, 2007], italics added, boldface omitted.)

■ In our view, the record supports the conclusion that riding as a passenger on a personal watercraft, meets the test from *Record*, because it "is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Record, supra,* 73 Cal.App.4th at p. 482.) It is evident from the nature of the vehicle that the activity is done for enjoyment or thrill. The vessel is open to the elements, with no hull or cabin. It is designed for high performance, speed

and quick turning maneuvers. The thrill of riding the vessel is shared by both the operator and the passenger. Obstacles in the environment such as spraying water, wakes to be crossed, and other watercraft are part of the thrill of the sport, both for the operator and the passenger. The connection between the water and the vessel that Cu Van described applies equally to both the operator and any passengers.

In *Shannon*, the court concluded that the passenger was not a coparticipant in sporting activity because the activity was benign and did not require physical exertion or skill. (*Shannon, supra,* 92 Cal.App.4th at p. 798.) The plaintiff in *Shannon* alleged the driver of the boat negligently failed to make sure the passengers were seated before accelerating the boat. (*Id.* at p. 794.) In contrast, when a multirider personal watercraft is accelerating and encounters a wave, the passenger can get some lift off the seat. (*Polaris, supra,* 139 Cal.App.4th at p. 760.) Unlike the benign activity of riding in a boat, riding a personal watercraft requires physical exertion and balance by the passenger to hold on to the operator or grips or handles on the vessel to avoid being thrown off or rolling off the craft. (*Id.* at pp. 760–761 & fns. 5, 6 [describing the grips and handles on the 2001 Polaris watercraft].) Physical skill and exertion is also required when the passenger falls off the personal watercraft. In that case, he or she must swim to the craft and climb on board. (*Id.* at p. 761, fn. 6 ["Polaris watercraft was equipped with . . . a rear grip handle primarily used for reboarding from the water"].) The court in *Peart* did not distinguish between the roles of the operator or the passenger of the Sea-Doos and described the activity as "riding" or "using" personal watercraft, rather than "operating" the vessel. (*Peart, supra,* 119 Cal.App.4th at p. 74.) In our view, Cu Van, Anthony, and Rachael were all coparticipants in the active sport of riding personal watercraft. Moreover, we agree with the trial court's conclusion that "[w]hether or not [Rachael] was exercising skill at the time of the accident is not the issue, but, in general the activity of riding a personal watercraft requires skill."

If we were to apply the rule Plaintiffs propose, the question whether a duty would be imposed on personal watercraft operators would depend on whether the operator had a passenger or was operating in the vicinity of other vessels that happened to have passengers. A rule that applies the doctrine to watercraft without passengers, but not to those carrying passengers, would alter the fundamental nature of the sport in that operators would have two separate standards to maintain while engaged in the activity. Such a rule would impose a duty to avoid intentional or reckless behavior with regard to other solo drivers but a duty to avoid negligent activity in the event there was a passenger on board the operator's own craft or another watercraft in the vicinity. In our view, this would create an unworkable, impractical scheme.

### G. Determining Applicability of Doctrine Based on "Casual" Versus "Extreme" Use

Citing section 655.7, subdivisions (c) and (e); *Davis v. LeCuyer, supra,* 849 N.E.2d 750 (*Davis*), an Indiana Court of Appeals case; and Indiana Code section 14-15-12-10, Plaintiffs argue that primary assumption of risk should not apply to the "casual" or "ordinary" operation of personal watercraft that occurred in this case as distinguished from the "extreme" operation of personal watercraft that occurs in tournaments, exhibitions, competitions, races, or parades.

In *Davis*, the Indiana appellate court declined to follow *Peart*, finding that the primary assumption of risk doctrine does not apply to "casual jet skiing." (*Davis, supra,* 849 N.E.2d at pp. 755–756.) The court found the "possibilities" that flowed from following the California decision would be "truly troubling" and "contrary to the unique Hoosier lifestyle." (*Id.* at p. 756.)

However, based on the vast differences between the California and Indiana comparative fault systems, the Indiana statutory scheme (which was enacted before Indiana case law applied the primary assumption of risk defense), and the Indiana court's limitation of the primary assumption of risk rule to *organized* sports and recreational activities, *Davis* has little persuasive value.

■ Moreover, we are not persuaded by Plaintiffs' statutory argument or their suggestion that courts should distinguish between "casual" and "extreme" sporting activities in applying the primary assumption of risk doctrine. In our view, such a distinction would be contrary to *Knight* and *Ford* and their progeny. *Knight* involved an "informal game of touch football . . . using a 'peewee' football" in a dirt lot adjoining the home of the parties' mutual friend who was throwing a Super Bowl party. (*Knight, supra,* 3 Cal.4th at p. 300.) Each team had four or five players and the participants did not discuss any rules before the game. (*Ibid.*) To distinguish between casual and extreme use as Plaintiffs urge, would mean that the doctrine would apply to an organized football game, but not the casual, pickup game in *Knight.* Plaintiffs' proposed distinction is clearly contrary to the holding in *Knight.* As *Knight* instructs, the proper focus is on the nature of the risks inherent in the sport or activity, and not the level at which the sport is played.

Moreover, in *Ford*, the court rejected the plaintiff's argument that while "a rule limiting a coparticipant's duty of care to the avoidance of intentionally injurious or reckless conduct appropriately may be applied to a 'competitive' sport such as the touch football game involved in *Knight*, such a limited duty should not apply in the context of a 'cooperative' sport such as waterskiing." (*Ford, supra,* 3 Cal.4th at p. 345.) The court explained that although most of

the authorities cited in *Knight* involved sports that are played by competing teams, the rationale of those decisions applies equally "to an active sport such as waterskiing even when it is engaged in on a noncompetitive basis." (*Ibid.*)

In *Whelihan*, the court rejected assertions that primary assumption of risk only applies to contestants in competitive events or spectator sports, and held "the doctrine applies equally to competitive and noncompetitive but active sports." (*Whelihan*, *supra*, 110 Cal.App.4th at p. 1573, citing *Knight*, *supra*, 3 Cal.4th at pp. 320–321 & *Ford*, *supra*, 3 Cal.4th at p. 345.) Plaintiffs' argument, if adopted, would also have the effect of basing the application of the doctrine of primary assumption of risk on a characterization of the use of equipment or action occurring at the very moment of injury, rather than basing the application of the doctrine on the general nature of the activity in which the participants are engaged and the relationship of the plaintiff and the defendant to the activity. (*Kahn*, *supra*, 31 Cal.4th at pp. 1003–1004.)

Finally, *Knight* and *Ford* held that under the primary assumption of risk rule, a defendant who is a coparticipant in a sporting activity could be held liable only if he or she "intentionally injured [the] plaintiff or engaged in conduct that was so reckless as to be totally outside the range of the ordinary activities involved in the sport." (*Ford*, *supra*, 3 Cal.4th at p. 345.) Plaintiffs do not argue that Cu Van's conduct was reckless or intentional or outside of the range of ordinary activity involved in using personal watercraft.

For all of these reasons, we conclude Defendants have met their initial burden of showing that primary assumption of risk applies to the facts of this case.

### H.  *Absence of Triable Issues of Material Fact*

We turn next to the question whether Plaintiffs have met their burden of raising a triable issue of material fact that precludes summary judgment. Plaintiffs contend a declaration submitted by Anthony creates a triable issue of material fact sufficient to defeat summary judgment. With regard to operation of personal watercraft, Anthony stated: "The waverunner personal watercrafts involved in the subject accident are very easy to operate and do not require athletic skills or abilities to operate. I have also operated jet skis which are operated while standing and do not accommodate passengers. Because of the configuration of jet skis and the necessity of standing while operating jet skis, the use of jet skis requires athletic abilities, such as balance and more skills to maneuver the craft, that waverunners do not require.

Operation of waverunners, on the other hand, [is] more akin to operation of a boat." With regard to the activities of the passenger, Anthony declared: "There are no skills, athletic abilities, physical prowess required to sit as a passenger on a waverunner." Anthony also stated he "only operated the subject watercraft to cruise around the water." He did not "engage[] in races or other forms of competition or maneuvers such as making sharp turns, jumps or fast accelerations, either at the time of the incident or on other occasions." Thus, Plaintiffs use Anthony's declaration to repeat their previous contention that primary assumption of risk should not apply to casual as opposed to extreme use of personal watercraft. As noted above that assertion is contrary to the holdings in *Knight* and *Ford* and their progeny. Moreover, in view of all the evidence and authority cited above, we do not think Anthony's *personal* views of the skills necessary to operate a personal watercraft and his declaration that he was "only . . . cruis[ing] around the water" create any triable issues.

For these reasons we conclude the court properly applied the doctrine of primary assumption of risk to Rachael's activities in this case.

## IV. *Plaintiffs' Negligence Per Se Causes of Action Against Cu Van*

Citing *Whelihan, supra*, 110 Cal.App.4th at page 1575, and *Peart, supra*, 119 Cal.App.4th at page 79, the trial court held that Plaintiffs' negligence per se causes of action lack merit because the primary assumption of risk doctrine trumps any duty that may be based on section 655, subdivision (a) or California Code of Regulations, title 14, section 6600.1, rules 5 and 8,[13] the code section and regulations at issue in this case. Plaintiffs did not address Defendants' arguments regarding the negligence per se and negligent entrustment causes of action on the merits in their papers below. Moreover, although they cite the regulations in their arguments regarding the applicability of primary assumption of risk to the negligence cause of action, they do not expressly address the trial court's ruling on the negligence per se claims in their opening brief on appeal. We note also that while Plaintiffs cite section 655.7, subdivisions (c) and (e) in support of their arguments on the negligence cause of action, they do not mention section 655, subdivision (a), the statute that is alleged as the basis for their fourth cause of action for negligence per se, anywhere in their brief. We therefore conclude that Plaintiffs have waived any claim of error with regard to the court's ruling on the negligence per se causes of action.

---

[13] See footnote 5 on page 872 of this opinion for the text of section 655, subdivision (a) and a brief description of the regulations at issue in this case.

In light of our conclusions, we hold the court properly granted summary judgment on the negligence and negligence per se cause of action against Cu Van.

## V. *Negligent Entrustment Cause of Action Against Chuong*

Plaintiffs argue the court erred in granting summary judgment in favor of Chuong because (1) Defendants relied on only three facts in their motion for summary judgment of the negligent entrustment cause of action; (2) Defendants' undisputed material fact (UMF) No. 5 goes to Chuong's state of mind and the court has discretion to deny summary judgment when based on state of mind under Code of Civil Procedure section 437c, subdivision (e); and (3) the trial court ignored the fact that Chuong bought the Yamaha the day before the accident, which raises a triable issue regarding Cu Van's experience with the vessel.

Our conclusion that the assumption of the risk doctrine applies to the negligence cause of action against Cu Van and relieved him of any duty to Rachael undercuts Plaintiffs claim of negligent entrustment. If Cu Van was not negligent because he had no duty to Rachael, then Chuong cannot be negligent in entrusting the vessel to Cu Van.

As for Plaintiffs' specific contentions, there were many more than three undisputed material facts that supported the court's finding on the negligent entrustment claim. Plaintiffs acknowledge that the following facts support Defendants' contentions regarding the negligent entrustment claim: (1) Cu Van had operated personal watercraft on multiple occasions before the date of the accident[14] (UMF No. 3); (2) Cu Van had no prior accidents involving personal watercraft (UMF No. 4); and (3) Chuong did not have any reservation about lending the Yamaha to Cu Van because Cu Van demonstrated the skill necessary to operate personal watercraft (UMF No. 5). However, Plaintiffs fail to acknowledge that it was undisputed that (1) Cu Van did not ingest any drugs or alcohol on the date of the accident (UMF No. 12); (2) that the speedometer and the visibility spout on the Yamaha were working on the date of the incident (UMF Nos. 16, 17); (3) there were no known mechanical defects on the Yamaha on the date of the accident (UMF No. 18); (4) Cu Van was wearing his glasses at the time of the incident (UMF No. 19); (5) Cu Van had operated the Yamaha or Chuong's other personal watercraft four or five times prior to the accident on the date it occurred (UMF No. 21); (6) Cu Van felt very comfortable operating both of

---

[14] Plaintiffs disputed this fact by arguing that Chuong had purchased the Yamaha the day before the accident. In our view, that does not create a triable issue, since it was undisputed that Cu Van had prior experience dating back to 2001, operating other personal watercraft that Chuong owned before buying the Yamaha.

Chuong's personal watercraft (UMF No. 22); (7) Cu Van never traveled faster than the posted 35 mph speed limit and was traveling at 25 mph at the time of the accident (UMF Nos. 24, 30); and (8) Cu Van followed the lake's posted traffic pattern (UMF No. 25). These facts support the court's conclusion that Plaintiffs could not state a cause of action for negligent entrustment against Chuong because they could not show any breach of duty.

Plaintiffs argue that the trial court had the discretion to deny the motion for summary judgment because Defendants' UMF No. 5 (Chuong did not have any reservation about lending the Yamaha to Cu Van because Cu Van demonstrated the skill necessary to operate personal watercraft) was based on Chuong's state of mind. While the court had the discretion to do so, it was not required to do so under Code of Civil Procedure section 437c, subdivision (e). Finally, nothing in the record supports Plaintiffs' contention that the court ignored evidence that Chuong had purchased the Yamaha the date before the accident. Nor does the fact that the Yamaha was new raise any triable issue with regard to Cu Van's prior experience riding personal watercraft.

For these reasons, we conclude the court did not err when it granted summary judgment of the negligent entrustment cause of action against Chuong.

DISPOSITION

The summary judgment is affirmed.

Duffy, J., concurred.

**MIHARA, Acting P. J.,** Concurring.—A person generally owes a duty of due care not to cause an unreasonable risk of harm to others. (Civ. Code, § 1714; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*).) One of the exceptions to this general rule is the doctrine of primary assumption of the risk. Under this doctrine, "sports participants have a limited duty of care to their coparticipants, breached only if they intentionally injure them or 'engage[] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.' " (*Shin v. Ahn* (2007) 42 Cal.4th 482, 486 [64 Cal.Rptr.3d 803, 165 P.3d 581], quoting *Knight v. Jewett* (1992) 3 Cal.4th 296, 320 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).) In determining whether the defendant owed a duty to the plaintiff, courts do not focus on "the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the

defendant and the plaintiff to that activity or sport." (*Knight*, at p. 309.) This doctrine applies not only to participants in competitive events, but also to those who "engaged in noncompetitive but active sports activity." (*Ford v. Gouin* (1992) 3 Cal.4th 339, 345 [11 Cal.Rptr.2d 30, 834 P.2d 724] (*Ford*).) "[A]n activity falls within the meaning of 'sport' if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Record v. Reason* (1999) 73 Cal.App.4th 472, 482 [86 Cal.Rptr.2d 547].) Whether the defendant owes a duty to the plaintiff is a question of law. (*Kahn, supra*, 31 Cal.4th at p. 1004.)

In *Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566 [2 Cal.Rptr.3d 883] (*Whelihan*), the record established that the "defendant drove his jet ski at 'a relatively high rate of speed' while making turns and maneuvers in 'relatively close proximity' to [the] plaintiff's jet ski. The jet skis collided when [the] plaintiff made a left turn in front of [the] defendant." (*Id.* at p. 1570.) The reviewing court reasoned that "jet skiing is an active sport involving physical skill and challenges that pose a significant risk of injury, particularly when it is done—as it often is—together with other jet skiers in order to add to the exhilaration of the sport by racing, jumping the wakes of the other jet skis or nearby boats, or in other respects making the sporting activity more challenging and entertaining. [Citations.]" (*Id.* at p. 1573, fn. omitted.) Thus, the *Whelihan* court held that the primary assumption of the risk doctrine barred the plaintiff's claims. (*Ibid.*)

The court in *Peart v. Ferro* (2004) 119 Cal.App.4th 60 [13 Cal.Rptr.3d 885] (*Peart*) reached the same conclusion. In *Peart*, the plaintiff was operating a two-seater Sea-Doo or personal watercraft while one of the defendants was operating a three-seater Sea-Doo. (*Id.* at pp. 65, 67, fn. 2.) As the plaintiff drove his Sea-Doo around the lake, he accelerated, made turns, and cut back and forth across the defendant's wake. The defendant was traveling at 30 miles per hour when the plaintiff accelerated to 45 to 50 miles per hour. The plaintiff then turned into the defendant's path, and the vehicles collided. (*Id.* at pp. 66–67.) The *Peart* court held that "there is no legally material difference between the jet skis at issue in *Whelihan* and the Sea-Doos used in this case" and agreed with the *Whelihan* court's "analysis of jet skiing as 'an active sport involving physical skill and challenges that pose a significant risk of injury to participants in the sport,' a description which applies equally to the recreational activity of riding a Sea-Doo." (*Id.* at p. 74.)

Under *Whelihan* and *Peart*, Cu Van Nguyen (Cu Van) and Anthony Nguyen (Anthony), as drivers of personal watercraft on a lake, were engaging in a sport that was subject to the doctrine of assumption of the risk. Cu Van also established that his conduct was within the range of ordinary activity

involved in the use of a personal watercraft, because a collision with another participant is an inherent risk of the sport. In my view, Rachael Truong (Rachael) was also a participant in this sport. The passenger of a personal watercraft is engaged in an activity that is done for enjoyment or thrill. A personal watercraft has no hull or cabin, thus bringing the passenger into close contact with the elements. The passenger also experiences the effects of high speed and quick turns, and will get some lift off the seat when the vessel encounters a wave. (*Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 760 [43 Cal.Rptr.3d 215].) Physical exertion and skill is also required of a passenger. Though the driver controls the speed and direction of the personal watercraft, the passenger must maintain his or her balance by holding on to the driver or handles on the vessel. In the event that the personal watercraft overturns or the passenger falls, the passenger must be able to stay afloat or swim to safety. The potential risk of injury also applies to the passenger. Thus, given the nature of the activity and that Cu Van, Anthony, and Rachael were coparticipants in the use of personal watercraft on a lake, Cu Van had no duty to Rachael. Accordingly, the trial court correctly found that the doctrine of primary assumption of the risk barred plaintiffs' negligence claim against Cu Van.[1]

The case of *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792 [112 Cal.Rptr.2d 217] (*Shannon*) is factually distinguishable from the present case. In *Shannon*, when the defendant accelerated his boat, the plaintiff, who was a passenger, fell out of the boat and was severely injured. In contrast to riding in a boat, riding on a personal watercraft requires physical exertion and skill, and the potential risk of injury is significantly greater.

Plaintiffs note that Anthony and Rachael were not traveling at high speeds, but merely taking a casual ride around the lake. Thus, they argue that courts should distinguish between "casual" and "extreme" sporting activities in applying the primary assumption of the risk doctrine. However, this distinction would be contrary to *Knight* and *Ford*. In *Knight*, the participants engaged in an "informal game of touch football . . . using a 'peewee' football" in a dirt lot. (*Knight, supra,* 3 Cal.4th at p. 300.) The *Knight* court did not focus on the level at which the sport is played, but on the nature of the risks inherent in the sport or activity. Similarly, in *Ford*, the court rejected the plaintiff's argument that this "limited duty should not apply in the context of a 'cooperative' sport such as waterskiing." (*Ford, supra,* 3 Cal.4th at p. 345.) The court reasoned that the rationale of the authorities cited in *Knight* applied equally "to an active sport such as waterskiing even when it is engaged in on a noncompetitive basis." (*Ibid.*) Thus, there is no merit to plaintiffs' argument.

---

[1] The trial court held that plaintiffs' negligence per se causes of action lacked merit. Since plaintiffs have not presented argument on this issue, they have waived any claim of error.

Plaintiffs also contend that the trial court erred in granting summary judgment in favor of Chuong Nguyen (Chuong). Plaintiffs alleged that Chuong negligently entrusted the personal watercraft to Cu Van.

"Liability for negligent entrustment amounts to a determination whether a duty exists to anticipate and guard against the negligence of others. [Citation.]" (*Lindstrom v. Hertz Corp.* (2000) 81 Cal.App.4th 644, 648 [96 Cal.Rptr.2d 874].) Since Cu Van had no duty to Rachael, thus precluding a negligence claim against him, Chuong could not be negligent in entrusting the personal watercraft to Cu Van. Accordingly, the trial court properly granted summary judgment in favor of Chuong.