[No. G038290. Fourth Dist., Div. Three. Oct. 28, 2008.]

CARL KINDRICH III et al., Plaintiffs and Appellants, v.
LONG BEACH YACHT CLUB et al., Defendants and Respondents.

1254

COUNSEL

Brunick, McElhaney & Beckett and Steven K. Beckett for Plaintiffs and Appellants.

Cogswell Nakazawa & Chang, Christina L. Owen and Dena S. Aghabeg for Defendants and Respondents.

**OPINION**

**RYLAARSDAM, J.**—Plaintiff Carl Kindrich III was injured while disembarking from a boat after participating in casting his late father's ashes into the ocean. He sued defendants Long Beach Yacht Club, the owner of the boat and the dock, and Charles Fuller, the boat's skipper, alleging they had been negligent in their use and maintenance of both the boat and the dock—specifically because they failed either to have someone on the dock to assist in tying off the boat when it returned, or to ensure that the portable steps, previously used in boarding the boat, would be available for his use when he attempted to disembark. Carl's wife, Barbara, and son, Michael, also sued. Barbara claimed loss of consortium, and Michael claimed emotional distress suffered as an aural percipient witness to his father's injury. (Because all three plaintiffs have the same last name, we will refer to them by their first names to avoid confusion and not out of disrespect.)

The trial court granted summary judgment to defendants, reasoning the doctrine of primary assumption of risk applied to Carl's decision to jump off the boat onto the dock. All plaintiffs appeal, contending the court improperly concluded that the act of jumping onto the dock was an activity subject to the complete defense of primary assumption of risk. We agree that the court's analysis was incorrect. Carl was not engaged in the type of sporting event where the doctrine of primary assumption of risk should be applied. At most Carl may have assumed risks, categorized as secondary assumption of risk, which are subsumed in contributory negligence. Whether he was contributorily negligent and, if so, how his negligence compares with that of defendants, if any, are questions of fact to be resolved by the trier of fact.

Defendants also contend summary judgment was properly granted because they were not negligent. But this is another question of fact and not subject to summary judgment. Defendants' additional issues, whether Barbara suffered damages and whether Michael's awareness of his father's accident qualifies him as a "bystander" entitled to recover on a theory of negligent infliction of emotional distress, also raise questions of fact.

We therefore reverse the summary judgment.

### FACTS AND PROCEDURAL HISTORY

The complaint alleges that plaintiffs and some of their relatives and friends gathered at the Yacht Club to participate in a "burial at sea" of the ashes of Carl's late father. The Yacht Club arranged for the attendees to be taken to the burial site on a boat it owned and maintained and assigned Fuller to pilot that boat. The Yacht Club provided portable stairs on the dock to assist the

attendees in boarding. Plaintiffs contend that, when the boat returned to the dock, the portable steps were no longer in place. According to the complaint, Fuller told Carl to tie off the boat; there was no one on the dock waiting to do so. As Carl "started to jump from the side of the boat onto the dock . . . , the boat and dock moved relative to each other causing [Carl] to fall and injure himself."

Plaintiffs allege causes of action for Carl's personal injury, Barbara's loss of consortium, and emotional distress suffered by Michael when he witnessed his father's accident.

Defendants moved for summary judgment. They argued that Carl's claim failed as a matter of law because (1) he assumed any risk of injury from his voluntary decision to jump onto the dock from the boat; and (2) they did not breach any duty of care they might have owed him and had no actual or constructive notice that the portable stairs may not have been in place when the boat returned to the dock. They also asserted that Barbara's claim failed as a matter of law, both because it was derivative of Carl's claim and because her discovery responses revealed no loss of consortium damages. Finally, defendants maintained Michael's claim failed as a matter of law because it was derivative of Carl's and because Michael was not actually aware of his father's injury until after it had occurred.

These are the relevant undisputed facts offered in support of the motion: Carl's father, a member of the Yacht Club before he died, had expressed the wish to be "buried at sea." The Yacht Club agreed to assist with such a burial and permitted the Kindrich family to use one of its boats, without charge, for the ceremony. The Yacht Club also agreed to let Fuller, one of its long-standing members and a good friend of Carl's father, pilot the boat for the ceremony.

Carl, Barbara, and Michael, along with other family members, used portable steps located on the dock to board the boat for the ceremony. After the ceremony was over, Carl and Michael were up on the bridge with Fuller, who piloted the boat back to the dock. According to Carl's testimony, "[a]fter the burial, we were bringing the boat in and . . . not too far from the dock, [Fuller] looked to me and says 'We have to tie up the boat, and someone else will have to help.' And Michael and I were the only two on the bridge . . . . And so Michael said that he would help . . . . [¶] . . . When [Fuller] turned the boat into the dock and we had gotten up to the dock and we were getting ready to get off the boat, Mike, my son, jumped to the dock. We didn't see the steps. The steps weren't there. And then after Mike jumped off, I jumped off, also . . . ."

Carl stated that at the moment he jumped off the boat, it was hit by the wake from another boat, causing it to "go up as he stepped off the boat and when he came down onto the deck, he broke his leg." The boat used for the burial ceremony does not require more than two people to tie it up when it reaches the dock—one person to operate the boat and one person on the dock to tie the lines.

Plaintiffs opposed the summary judgment, arguing this was not a proper case for applying the doctrine of primary assumption of the risk, and the case could not be summarily adjudicated on the basis that defendants acted with reasonable care as a matter of law. Plaintiffs argued there were numerous factual disputes relating to whether defendants satisfied the duty of care they owed to the passengers on their boat, and those issues must ultimately be resolved by a jury.

At the hearing, the court explained its initial thinking in favor of granting the summary judgment: "We have some conflicts in the facts as to whether he jumped, or stepped, or lowered himself, or whatever, but that doesn't matter. What didn't happen was he wasn't pushed. He wasn't ordered. He voluntarily undertook an activity that was inherently dangerous; namely, disembarking from a moving boat obviously onto the dock and he hurt himself. [¶] I believe that without really much hesitation that . . . primary assumption of the risk applies and the motions should be granted for summary judgment."

Although plaintiffs' counsel attempted to persuade the court that Fuller directed Carl to assist in tying up the boat, and thus his decision to jump from the boat should not be regarded as voluntary, the court did not agree. "[Carl] assumed the risk of something in this recreational activity going wrong. [¶] It did go wrong. The precise wrong is irrelevant. One way or the other he voluntarily disembarked the boat . . . with the idea of going onto the dock, and this was an unsafe thing to do."

The formal order granting the motion cited two bases. First, the court found that "even if the portable steps were actually missing when the vessel . . . arrived back at dock after the burial at sea, [d]efendants had no notice, constructive or actual, of their absence. . . . [¶] The Court additionally finds that [d]efendants are entitled to summary adjudication on their Fourth Affirmative Defense because when [p]laintiff . . . made the deliberate and conscious decision to jump from the vessel . . . to the dock, he, with full knowledge thereof, knowingly and voluntarily assumed the risk of sustaining injury. (See *Meintsma v. United States* [(9th Cir. 1947)] 164 F.2d 976 . . . ; see also *DeRoche v. Commodore Cruise Line, Ltd.* (1994) 31 Cal.App.4th 802, 810 [46 Cal.Rptr.2d 468] ('[It] is settled that there is no duty to warn of a danger that is as obvious to the injured party as to the defendant.').)"

The order granted summary judgment against Barbara and Michael as well, concluding Barbara's claim for loss of consortium was derivative as a matter of law and that any distinct claim for emotional distress was precluded by the fact she did not actually witness Carl's injury. As to Michael's claim, the court concluded that a bystander's recovery for extreme emotional distress was dependent upon a determination the injury he witnessed was negligently inflicted. Since Carl's negligence claim failed, Michael's did as well.

## DISCUSSION

*Primary Versus Secondary Assumption of Risk*

■ Even were we to conclude that Carl's decision to jump off the boat was a voluntary one, and that therefore he assumed a risk inherent in doing so, this is not enough to provide a complete defense. Because voluntary assumption of risk as a complete defense in a negligence action was abandoned in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226], only the absence of duty owed a plaintiff under the doctrine of primary assumption of risk would provide such a defense. But that doctrine does not come into play except when a plaintiff and a defendant are engaged in certain types of activities, such as an "active sport." That was not the case here; plaintiff was merely the passenger on a boat. Under *Li*, he may have been contributorily negligent but this would only go to reduce the amount of damages to which he is entitled.

Before *Li*, contributory negligence and voluntary assumption of risk were distinct and complete defenses in an action for negligence. Under certain circumstances, the "last clear chance" doctrine provided relief from the harshness of the rules. *Li* changed all that. It adopted the doctrine of comparative negligence and held that "[t]he doctrine of last clear chance is abolished, and the defense of assumption of risk is also abolished to the extent that it is merely a variant of the former doctrine of contributory negligence; both of these are to be subsumed under the general process of assessing liability in proportion to negligence." (*Li v. Yellow Cab Co., supra*, 13 Cal.3d at p. 829.)

*Li* recognized that there are at least two distinct forms of assumption of risk. "As for assumption of risk, we have recognized in this state that this defense overlaps that of contributory negligence to some extent and in fact is made up of at least two distinct defenses. 'To simplify greatly, it has been observed . . . that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . .

Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care.' [Citations.] We think it clear that the adoption of a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence. [Citation.]" (*Li v. Yellow Cab Co., supra*, 13 Cal.3d at pp. 824–825.)

So, to the extent that " ' "a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence," ' " he or she is subject to the defense of comparative negligence but not to an absolute defense. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 305–306 [11 Cal.Rptr.2d 2, 834 P.2d 696].) This type of comparative negligence has been referred to as " 'secondary assumption of risk.' " (*Id.* at p. 308.) Assumption of risk that is based upon the absence of a defendant's duty of care is called " 'primary assumption of risk.' " (*Ibid.*) "First, in 'primary assumption of risk' cases—where the defendant owes no duty to protect the plaintiff from a particular risk of harm—a plaintiff who has suffered such harm is not entitled to recover from the defendant, whether the plaintiff's conduct in undertaking the activity was reasonable *or unreasonable*. Second, in 'secondary assumption of risk' cases—involving instances in which the defendant has breached the duty of care owed to the plaintiff—the defendant is not entitled to be entirely relieved of liability for an injury proximately caused by such breach, simply because the plaintiff's conduct in encountering the risk of such an injury was *reasonable* rather than unreasonable." (*Id.* at p. 309.)

Primary assumption of risk, " ' "where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him" ' " (*Knight v. Jewett, supra*, 3 Cal.4th at p. 306), remains as a complete defense. That defense was not fully developed until our Supreme Court decided *Knight v. Jewett*. There, Knight sued Jewett for negligence and assault and battery after she was injured when Jewett knocked her over and stepped on her finger during a touch football game. In affirming summary judgment for the defendant, the court held that under the doctrine of primary assumption of risk, the defendant did not owe the plaintiff a duty. It "conclude[d] that a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320, fn. omitted.)

■ *Knight* shifted the focus of assumption of risk from a plaintiff's "subjective knowledge and awareness" of the risk to the nature of the activity in question. (*Knight v. Jewett, supra*, 3 Cal.4th at p. 313.) "In cases involving 'primary assumption of risk'—where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury—the doctrine continues to operate as a complete bar to the plaintiff's recovery." (*Id.* at pp. 314–315.) *Knight* justified maintaining the defense in a sports setting because there "conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself" (*id.* at p. 315), and imposing liability "might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule" (*id.* at p. 319). The focus of the questions should consider the nature of the activity and the relationship of the parties to the activity. (*Id.* at p. 315.)

There are situations other than active sports where under the doctrine of primary assumption of risk a plaintiff is held to agree to relieve a defendant of an obligation of reasonable conduct toward him or her. For example, *Knight* stated, "In addition to the sports setting, the primary assumption of risk doctrine also comes into play in the category of cases often described as involving the 'firefighter's rule.' [Citation.] In its most classic form, the firefighter's rule involves the question whether a person who negligently has started a fire is liable for an injury sustained by a firefighter who is summoned to fight the fire; the rule provides that the person who started the fire is not liable under such circumstances. [Citation.] Although a number of theories have been cited to support this conclusion, the most persuasive explanation is that the party who negligently started the fire had no legal duty to protect the firefighter from the very danger that the firefighter is employed to confront. [Citations.] Because the defendant in such a case owes no duty to protect the firefighter from such risks, the firefighter has no cause of action even if the risk created by the fire was so great that a trier of fact could find it was unreasonable for the firefighter to choose to encounter the risk." (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 309–310, fn. 5.)

Other examples of primary assumption of risk are the so-called veterinarian's rule (e.g., *Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1121, fn. 1 [47 Cal.Rptr.3d 553, 140 P.3d 848]) or where the plaintiff is hired to undertake a particular, dangerous job (e.g., *Farnam v. State of California* (2000) 84 Cal.App.4th 1448, 1455 [101 Cal.Rptr.2d 642]; *Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761, 1765 [53 Cal.Rptr.2d 713]). But for purposes of this case, we need only consider whether Carl's injuries occurred while he was engaged in an "active sport," which relieved defendants of a duty of care.

There are more than 100 published cases defining what is and what is not an "active sport" qualifying for application of the doctrine of primary assumption of risk. "Since the decision in *Knight*, which involved a recreational game of touch football, our state Supreme Court and appellate courts have examined the applicability of the primary assumption of the risk defense in a wide variety of cases involving sports and recreational activities. In *Ford*[ *v. Gouin* (1992)] 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724], the companion case to *Knight*, the Supreme Court expanded the doctrine and applied it to the noncompetitive, nonteam sporting activity of waterskiing. The Supreme Court has applied the doctrine to other sports, including intercollegiate baseball (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161 [41 Cal.Rptr.3d 299, 131 P.3d 383]), swimming (*Kahn*[ *v. East Side Union High School Dist.* (2003)] 31 Cal.4th [990,] 1004–1005 [4 Cal.Rptr.3d 103, 75 P.3d 30] [examining coach's relationship to sport]), and snow skiing (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067–1068 [68 Cal.Rptr.2d 859, 946 P.2d 817] . . .). [Citation.] The Courts of Appeal have applied the primary assumption of the risk rule in cases involving snow skiing (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855]), 'off-roading' with a motorcycle or 'dune buggy' (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1255, 1259–1265 [102 Cal.Rptr.2d 813]), skateboarding (*Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 115–117 [96 Cal.Rptr.2d 394]), figure ice skating (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632–1636 [53 Cal.Rptr.2d 657]), and long-distance group bicycle riding (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1218–1223 [130 Cal.Rptr.2d 198]), to name a few." (*Truong v. Nguyen* (2007) 156 Cal.App.4th 865, 878–879 [67 Cal.Rptr.3d 675] [primary assumption of risk applied to bar action for injury to passenger on jet ski].)

In *Record v. Reason* (1999) 73 Cal.App.4th 472 [86 Cal.Rptr.2d 547], the court held that where the plaintiff was injured when he fell off an inner tube while being towed behind a motor boat, primary assumption of risk applied. In doing so, the court considered the issue of whether a particular activity was a "sport" such that the doctrine should be applied. After reviewing a substantial number of cases applying primary assumption of risk to a variety of activities, the court concluded that "[c]ompiling all of the distinguishing factors, it appears that an activity falls within the meaning of 'sport' if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Id.* at p. 482.) Although we agree with the result in *Record* its reliance on a plaintiff's subjective reasons for participating in a sport seems inconsistent with *Knight*'s test, which focuses on whether imposing liability would "alter fundamentally the nature of the sport by deterring participants from" vigorous participation. (*Knight v. Jewett, supra*, 3 Cal.4th at p. 319.)

 *Stimson v. Carlson* (1992) 11 Cal.App.4th 1201, 1205 [14 Cal.Rptr.2d 670] applied primary assumption of risk to sailing where the plaintiff was one of the crew operating the boat; the court noted that sailing involves swinging booms and physical participation of crew. But in our case, plaintiff was not a participant in the "sport" of boating or in any "active sport." He was a passenger. Thus this activity does not fall within the test set out in *Knight*, i.e., that to hold defendants owed no duty to plaintiffs would "alter fundamentally the nature of [a] sport by deterring participants from" vigorous participation. (*Knight v. Jewett, supra*, 3 Cal.4th at p. 319.)

This case is more analogous to *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792 [112 Cal.Rptr.2d 217]. There a six-year-old child and her siblings sued the owner and operator of a ski boat for negligence arising from injuries sustained by the child when she fell from the boat into the boat's propeller. The Court of Appeal reversed summary judgment, holding that primary assumption of risk did not apply. The court noted, "Our analysis begins by examining with what activity the *Knight* court was concerned. In *Knight*, the court came to the commonsense conclusion that when two people are playing a sport together one should not be liable to the other for injuries sustained while playing that sport absent some recklessness or intentional misconduct. [Citation.] The parties in *Knight* were engaged in a recreational game of football, clearly a physical activity and 'sport' within any common understanding of the word." (*Id.* at p. 796.) *Shannon* held that the defense did not apply where the plaintiff was merely a passenger in the ski boat. (*Id.* at p. 801.)

*Shannon* distinguished *Ford v. Gouin, supra*, 3 Cal.4th 339, the waterskiing case, by noting that in *Ford*, our Supreme Court "explicitly used the language 'noncompetitive *but active* sports activity' in applying the doctrine to waterskiing. [Citation.] A review of the reasoning set forth in *Ford* makes clear that the court focused on the physical skill and risk involved in the waterskiing itself to conclude that the activity of waterskiing was a sport, and the boat driver a coparticipant in that sport. [Citation.] The same certainly cannot be said of a mere passenger in a boat . . . ." (*Shannon v. Rhodes, supra*, 92 Cal.App.4th at p. 798.)

 Here, the trial court characterized the activity in which plaintiff engaged as "jumping" rather than boating. We disagree that we must surgically separate an activity's constituent parts apart from the general activity in which the plaintiff was engaged. Carl was engaged in boating, not in jumping. If he had been a jumper, in the sense of one who competes in athletic events, our conclusion would be different. But he was disembarking from the boat; his method of doing so, be it leaping, jumping, stepping off, or walking the gangplank, did not turn his activity into an "active sport."

We therefore conclude that the doctrine of primary assumption of risk does not bar plaintiffs' action.

*Defendants' Remaining Arguments*

■ We need not expend a great deal of time dealing with the rest of defendants' arguments. Although these were not the basis for the grant of summary judgment, we will comment briefly. Defendants contend they acted with reasonable care. But this argument should be made not to us but to the trier of facts. Whether reasonable care has been exercised is normally a question of fact. (*Butigan v. Yellow Cab Co.* (1958) 49 Cal.2d 652, 656 [320 P.2d 500].) Even if defendants were not responsible for the removal of the steps, and they contend the steps were there, this would only be one possible theory of liability. And, in light of the conflicting evidence, it is not for us to decide whether the steps were removed and, if so, by whom.

■ As to defendants' argument that Carl's wife, Barbara, did not sustain damages to support her loss of consortium claim, the contention rests on the absence of evidence of physical injuries. But, as plaintiffs point out, "[a]lthough loss of consortium may have physical consequences, it is principally a form of mental suffering." (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 401 [115 Cal.Rptr. 765, 525 P.2d 669].)

■ Defendants' final argument is equally specious. Whether or not Carl's son, Michael, had such a contemporaneous sensory awareness of the accident as to satisfy the requirements of *Thing v. La Chusa* (1989) 48 Cal.3d 644, 668–669 [257 Cal.Rptr. 865, 771 P.2d 814] is again a question of fact, not to be resolved by us.

## DISPOSITION

The judgment is reversed. Appellants shall recover their costs.

Sills, P. J., concurred.

**BEDSWORTH, J.,** Dissenting.—"No good deed goes unpunished" has become a truism of modern life. Today, by allowing suit against a yacht club that tried to help one of the sons of a member in his time of grief, only to be sued when he hurt himself intruding into their conduct of the good deed, my colleagues give this sad commentary on modern society the force of law. I respectfully dissent from that.

Carl Kindrich III was injured when he jumped off a boat and onto a dock. He did so voluntarily, after he knew his adult son, Michael, had already

gotten onto the dock to assist in tying off the boat. There is absolutely no evidence that anyone suggested, let alone required, that Kindrich himself must get off the boat prior to the time the stairs were put into place on the dock for the egress of passengers. Nonetheless, Kindrich, along with his wife and son, sued both the Long Beach Yacht Club and Charles Fuller, the Yacht Club member who captained the boat, alleging they were responsible for his injuries.

The trial court granted summary judgment to defendants, and I would affirm that judgment. I believe the trial court properly concluded that Kindrich's specific act of "jumping onto the dock," rather than the more generic and sedate "boating" was the relevant "activity" for purposes of assessing his assumption of risk. In my view, jumping or stepping some two and one-half or three feet off the side of a boat onto a dock—merely because portable steps had not yet been put into place—is no more an integral part of "boating" than diving out a window—because no one has yet opened the door—is an integral part of visiting a house.

This was not an outing or an excursion. It was not a leisurely sail. The trip was made to dispose of the ashes of Kindrich's father. The injury in question was not the result of "boating." Kindrich was not swept off the boat by a wave or hit by a jib. He jumped off the boat at the conclusion of the trip before the boat had been tied up. His injury was the result of his sudden decision he would leap off the boat rather than waiting for his son to finish tying it off and ensuring debarkation could be safely accomplished.

It is undisputed that defendants *did not* expect, let alone require, that passengers would have to jump off this particular boat as part of the "boating" experience. To my mind, the existence of portable stairs, which had been used by these passengers when boarding the boat, and were intended to be kept on the dock for the passengers to use in both getting on and off the boat, rather conclusively establishes the lack of any such expectation. And Kindrich's own testimony demonstrates that even *he* did not consider jumping off the side of the boat onto the dock to be a normal part of this boat ride, let alone an integral part of the activity of "boating" in general. As Kindrich explained it, he not only did not expect that anyone else on the boat would be jumping off, he believed them *unable* to do it.[1]

Moreover, there is no evidence that anyone—either Fuller or the Yacht Club—imposed some special obligation on Kindrich to jump off the boat and

---

[1] As Kindrich explained in his deposition, "Jim, my brother, has a back to where he can't do a lot of jumping; Mary Ann would not be capable of doing it; Lisa wouldn't be capable of doing it; my grandsons would not be capable of doing it. And the other two gentlemen would not be capable of doing it."

be on the dock while it was being tied up. Instead, Kindrich's own testimony establishes that (1) Fuller merely stated (either directly to Kindrich or generally to him and his son) that it was necessary to tie up the boat, and "someone else" would have to assist; (2) Kindrich's son immediately volunteered to do that; and (3) Kindrich was aware his son had already jumped onto the dock for the purpose of tying off lines *before* his own ill-fated attempt to follow suit. Even assuming it was actually necessary for "someone" to be on the dock—a fact disputed below—it is uncontested that need had been met *prior* to Kindrich's jump.

Under these facts, it is clear that jumping off the boat before the stairs were in place was not a requirement placed generally on those who were passengers on the boat, and it was not a requirement placed specifically on Kindrich by any defendant.[2] Hence, Kindrich's decision to do so was simply an optional, and entirely voluntary act, which must be distinguished, for analytical purposes, from any normal aspect of "boating."

As my colleagues seem to concede, when Kindrich's activity is construed not as an integral part of "boating" but rather as simply an impetuous act of "jumping off the boat," it falls within the scope of "athletic" endeavors, which includes those noncompetitive activities requiring some level of "physical skill and risk," and thus primary assumption of the risk would apply. (See *Ford v. Gouin* (1992) 3 Cal.4th 339, 345 [11 Cal.Rptr.2d 30, 834 P.2d 724]; *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 798 [112 Cal.Rptr.2d 217].) Because I see it that way, I would apply that doctrine, and grant the summary judgment.

But I should also note that I disagree with the majority's analysis for an additional reason. As they explain, they considered Kindrich's situation to be more analogous to *Shannon v. Rhodes, supra,* 92 Cal.App.4th 792, in which the injured plaintiff, a six-year-old child, was merely a passenger when she fell out of a boat that lurched unexpectedly, than to *Stimson v. Carlson* (1992) 11 Cal.App.4th 1201 [14 Cal.Rptr.2d 670], in which the court applied primary assumption of the risk to a plaintiff who was injured while serving as a crewmember on a sailboat. If that is the analysis, it would lead me to the opposite conclusion. After all, a cornerstone of Kindrich's theory of liability

---

[2] Of course, I do not mean to suggest Kindrich necessarily thought through these events with the specificity I have just employed. Presumably, he just figured if Fuller needed help getting the boat tied onto the dock, he was willing to do whatever he could to assist. But that instinct is the essence of *volunteerism*: "Somebody ought to do it, might as well be me" is not the same thing as being *specifically assigned* a task. And the fact Fuller might even have appreciated having two people on the dock is not the same thing as concluding he actually directed Kindrich to get onto the dock—by whatever means possible—as soon as the boat arrived. Based upon the evidence in this case, the trial court correctly determined Kindrich was acting voluntarily when he jumped off the boat.

is the assertion he had *agreed to help with the docking of the boat*, which is why—unlike the other passengers—he could not simply *wait for the stairs to be put in place* before getting onto the dock. If we accept his view, it seems clear that at the time of the accident, Kindrich had assumed the role of "crew," rather than remaining a mere passenger. That would bring him within the majority's characterization of *Stimson*. For that reason as well, I would affirm the judgment.

My colleagues have expanded civil liability beyond previous decisional law and beyond my ability to sign on. This ship will have to sail without me.

Respondents' petition for review by the Supreme Court was denied February 11, 2009, S168902. Werdegar, J., did not participate therein.