Filed 12/19/25  Mazzulla v. Eliminator Custom Boats CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NICK MAZZULLA,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>ELIMINATOR CUSTOM BOATS, INC., ET AL.,<br><br>　　　Defendants and Respondents. | A172272<br><br>(San Bernardino County Super. Ct. No. CIVDS1812883) |

Appellant Nick Mazzulla and respondent Sean O'Connor were long-time friends.  Both had extensive experience with boats, and over the years each had been a guest on the other's boats.  In May 2017, O'Connor acquired a speed boat and invited Mazzulla to join him on its first trip, a Memorial Day outing on the Colorado River.  In the course of the outing, O'Connor drove at speeds up to 70 miles per hour, and then reduced his speed as he came to a more congested section of the river, when the boat hit a wake, became airborne, crashed back down into the water, the hull "came apart"—and Mazzulla was thrown out of the boat.

Mazzulla sued O'Connor and the manufacturer of the hull.  The case came on for jury trial in 2024 and, following lengthy deliberations, the jury found both O'Connor and the manufacturer negligent, but further found that

1

neither's negligence was a substantial factor in causing Mazzulla's injuries.

Mazzulla appeals, making two arguments: (1) the trial court erred in instructing the jury on assumption of risk, and (2) "the jury['s] confusion and bias created by the" instruction were "substantial in prejudicial scope and effect." We reject the arguments and we affirm.

## PROLOGUE

This appeal comes to us by order transferring it from the Fourth Appellate District Court of Appeal, Division Two, and arises out of a jury trial in San Bernardino Superior Court. Mazzulla, represented in the appeal by the same attorneys who represented him below, has provided an appellate record that is woefully inadequate, a record that consists of two items: (1) seven volumes of reporter's transcripts that contains trial proceedings over five days (despite Mazzulla's attorney's representation that the case lasted 10 days); and (2) an "appellant's appendix" that consists in its entirety of seven items that the appendix lists as "exhibits".[1] Such appendix violates the Rules of Court.

Rule 8.124 of the California Rules of Court, entitled "Appendixes,"

---

[1] The appendix reads as follows:
"Index of Appendix Exhibits
"Exhibit A: Subject CACI 470 Primary Assumption of Risk Instruction (Filed and Given at Trial March 20, 2024)
"Exhibit B: Appellant's Objection to Subject CACI 470 Primary Assumption of Risk Instruction [¶] (Filed March 20, 2024)
"Exhibit C: Subject Special Verdict Form and Judgment (Filed May 8, 2024)
"Exhibit D: Appellant's Motion for New Trial (Filed May 30, 2024)
"Exhibit E: Exhibit 3-1 (Picture of Damaged Boat in Water Following Accident) [¶] (Admitted March 4, 2024)
"Exhibit F: Exhibit 49-2 (Picture of Damaged Boat Out of Water) (Admitted March 4, 2024)

mandates in subsection (b) the required "[c]ontents of appendix" (boldface and capitalization omitted), and provides in pertinent part as follows:

"(1) A joint appendix or an appellant's appendix must contain:

"(A) All items required by rule 8.122(b)(1), showing the dates required by rule 8.122(b)(2);

"(B) Any item listed in rule 8.122(b)(3) that is necessary for proper consideration of the issues, including, for an appellant's appendix, any item that the appellant should reasonably assume the respondent will rely on; [and]

"(C) The notice of election . . . ."

The referenced Rule 8.122, entitled, "Clerk's Transcript," provides what must be in it—and thus in an appellant's appendix:

"**(b) Contents of transcript**

"(1) The transcript must contain:

"(A) The notice of appeal;

"(B) Any judgment appealed from and any notice of its entry;

"(C) Any order appealed from and any notice of its entry;

"(D) Any notice of intention to move for a new trial, or motion to vacate the judgment, for judgment notwithstanding the verdict, or for reconsideration of an appealed order, and any order on such motion and any notice of its entry;

"(E) Any notices or stipulations to prepare clerk's or

---

"Exhibit G: Subject *Howell* Stipulation [¶] (Given to Jury March 20, 2024)[.]" (Capitalization omitted.)

reporter's transcripts or to proceed by agreed or settled statement; and

"(F) The register of actions, if any.

"(2) Each document listed in (1)(A), (B), (C), and (D) must show the date necessary to determine the timeliness of the appeal under rule 8.104 or 8.108."

As is apparent from a comparison of the rules to the index, with the exception of two items (the judgment and the motion for new trial), all the many required documents are missing from the appendix.

In addition, the absence of the materials bears directly on various assertions in Mazzulla's brief, most significantly the fundamental contention that assumption of risk was injected late in the game—as his brief puts it, "inappropriate, last minute." Mazzulla's appendix does not contain the defendants' answers that would reflect whether the defense was asserted in those answers—as it was. And the absence of the proposed instructions does not allow us to determine whether the instruction was proposed pre-trial as required (see Code Civ. Proc., § 607a)—as it apparently was.

Finally, we note that Mazzulla's "Statement of the Facts" purports to describe the "negligence" of the defendants, doing so with hardly any record citations,[2] a statement that ignores much of what occurred in this lengthy trial. This too is a violation of a Rule of Court, this time California Rules of Court, rule of 8.204(a)(2)(C) that provides that an appellant's opening brief

---

[2]     California Rules of Court, rule 8.204(a)(1)(C) requires that any reference to a matter in the record, whether factual or procedural, be supported by a citation to the volume and page number of the record where the matter appears. (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.)

4

shall "[p]rovide a summary of the significant facts . . . ." And the leading California appellate practice guide instructs about this: "Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [Citation.] [¶] Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2024) [¶] 9:27 (Eisenberg), italics omitted.) Such summary is missing here.

Furthermore, where, as here, "the appellant fails to provide an adequate record of the challenged proceedings, we must presume that the appealed judgment or order is correct, and on that basis, affirm." (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 644.) As our Supreme Court explained: "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] . . . 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court. "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented." ' [Citation.] ' " 'A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed.' " ' [Citation.] 'Consequently, [the

5

appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609, fn. omitted.)

We nonetheless review the record and to the best of our ability set forth what occurred below and address the two issues in Mazzulla's appeal.

## BACKGROUND

### The Boaters

Mazzulla and O'Connor had been friends since they were teenagers or at least their early twenties, a friendship that continued as they married and had families. They went camping together; their families socialized with one another and took trips together; they sometimes worked together; and their children shared various activities. They were, O'Connor said, "very good friends"; Mazzulla agreed.

O'Connor and Mazzulla both had extensive experience with boats and boating. O'Connor operated boats for 20 years, many times on the Colorado River. Mazzulla, a self-employed contractor, owned several boats himself, and in fact started out 2017 in the ocean and in Newport with an off-shore vessel described as a speed boat. Over the years each had been a guest on the other's boats.

Other aspects of Mazzulla's experience became a focus of much testimony at trial, beginning with the fact that in 2000, at the age of 18, he was involved in a serious motorcycle accident, which he described as being "short on a jump." The accident caused a burst fracture to his back, and he had a fusion. He lived with constant lower back pain and, as he admitted, took Vicodin regularly, some four times a month.

Mazzulla's medical history following the 2000 accident was extensive,

6

as over the 24 years prior to trial he was seen by various professionals and treated at various facilities in San Bernardino County.  Despite that, the two primary expert medical witnesses called on his behalf were two Los Angeles doctors to whom he had been referred by his attorneys, which doctors first saw him a few months before trial.

In addition to his medical history, some of Mazzulla's activities also became the subject of testimony.  One such item was that in December 2017, some seven months after the incident here, Mazzulla participated in an event that involved him driving his dune buggy, apparently doing jumps with it.  Another item was a video from December 2023 and January 2024, shortly before the trial here, showing Mazzulla driving a dune buggy "quickly, jumping over things."

**The Boat**

The boat involved is a 28-foot long model named the Fundeck.  It is essentially custom-made, that is, not mass produced as part of an assembly line, its hull manufactured by Eliminator Custom Boats, Inc. (Eliminator).  Kenneth Smith, the head of Eliminator's customer service department, and himself involved in the manufacture of the hull, testified that the boat is sold as a "fast boat", its hull designed for speeds up to 100 miles per hour.  This particular Fundeck, with the Mercury factory motor installed in it, could reach speeds of 80 to 84 miles per hour.  It is, in short, designed to go at high speeds and over choppy water.  As Smith put it, customers buy Eliminator "because they want to go as fast as they can."

O'Connor acquired the boat in May 2017, some two weeks before Memorial Day.  He was not the first owner of the boat, but bought it used, for $150,000.  He test drove the boat before buying it, but the day of the incident here was the first time O'Connor drove it as its new owner, with Mazzulla on

7

the Colorado River.

**The Incident**

O'Connor described how they were on the river for some two hours, during which time he drove the boat up to 65 to 70 miles per hour without incident. As they were approaching a more congested part of the river, O'Connor slowed down, estimating that he was going 45 to 50 miles per hour in "non-glassy"—i.e., not smooth—conditions, when, as he described it, "the boat traffic started to pick up so I slowed the boat down. There was a wakeboard boat ahead of me and I hit a large wake. After I hit the wake the boat become [*sic*] airborne and the boat came down and hit the water and the boat torpedoed into the water. [Mazzulla] was ejected out of the boat when the boat impacted the water." And the hull came apart.

Mazzulla, himself an experienced boater, testified there was nothing unusual or out of the ordinary about the manner in which O'Connor was operating the boat prior to hitting the wake. O'Connor was paying attention, Mazzulla said, and he felt comfortable being a passenger in the boat. But moments before the incident, Mazzulla spotted a rogue wake and grabbed the handle on the boat, and "was holding on the handle with my dear life."

**The Proceedings Below**

At some point, Mazzulla filed a complaint apparently naming as defendants O'Connor and Eliminator.[3] We do not know what was alleged against each defendant, but review of the jury verdict indicates that the trial included claims of negligence against both defendants and also two strict liability claims against Eliminator, for manufacturing defect and failure to

---

[3]    We say "apparently" because, as noted, the complaint is not in the record.

warn.

At some point, O'Connor and Eliminator filed their answers that, according to later statements by the trial court, both contained the affirmative defense of assumption of risk.

The trial took place in 2024, but we do not know precisely when it began. According to the reporter's transcript, the first day of testimony was on February 29. As indicated, the transcript before us contains the proceedings on five days—February 29, March 4, 14, 19, and 20—with March 19 and 20 being the days on which closing arguments were given and the matter submitted to the jury. However, Mazzulla's attorney represented that the trial lasted 10 days and 21 witnesses testified.[4]

In light of Mazzulla's 2000 motorcycle accident and the injury and surgery that resulted from it, much evidence was presented as to how that impacted Mazzulla over the 23 years before trial, which included testimony about doctors who treated him and places he was treated. It also included, of course, the testimony of Mazzulla himself, who was on the stand on three separate occasions, in the course of which he described how he was knocked "unconscious" by the incident and spent several days in the hospital. It also included testimony about the claimed pain and other consequences that followed, all of which bore on the issue of damages that should be awarded him due to the incident. Mazzulla's briefing here says little, if anything, about this.

But such evidence played a significant part in Mazzulla's attorney's

_____

[4]    The transcripts provided to us contain the testimony of eight witnesses (with O'Connor testifying on two separate occasions): Two on February 29; three on March 4; and four on March 14.

9

lengthy closing argument, where he devoted some 30 pages to the issue of damages, summing up that Mazzulla was seeking over $12 million, based on three components: (1) past medical expenses of $55,609; (2) other economic damages, consisting of "the cost of the spine surgery[,][5] [t]he life care plan, and the [f]uture lost earnings" of $783,240; and (3) non-economic damages for pain and suffering of $11-plus million. This last component was based on $250,000 a year for some 45 years, the seven years prior to trial and the 37.8 years of Mazzulla's life expectancy based on actuarial tables.

The defendants' attorneys saw it much differently. The argument by Eliminator's attorney is illustrative and we quote it in some detail, his position as to the "pain that needs to be compensated if you decide to compensate [Mazzulla]." Thus:

"But let's examine what his condition is. Let's examine the history. And let's examine the quality of evidence that plaintiff put on.

"Now, when I first talked to you I said that most of Mr. Mazzulla's problems are associated with his lower back. It goes back to an accident that he had in 2000 where he broke his back and he had a fusion at L2 and L4. I'm not going to go through all that again, but you know about that.

"You also know that he was complaining of chronic pain in his lower back for 17 years. He was taking Vicodin and that's how he was addressing his pain. This accident then happens and he goes to see Dr. Steinman.

"Now, I heard Mr. Orland say that Dr. Steinman is a DO and he's not criticizing him. But Dr. Steinman is the only treating physician that you got to hear from in this case. The defense called him. We're not afraid of his

---

[5] As of the time of trial, some seven years after the incident, Mazzulla had not had surgery.

10

testimony. We're not afraid of any of the treating physicians. But the plaintiff never called him.

"Plenty of fine doctors at Loma Linda, Arrowhead Orthopedic and Kaiser. Plaintiff didn't call any of those doctors, because they knew what those doctors would be telling you. They would be telling you that all of plaintiff's problems are associated with his lower back. That's what they would be telling you. That's what the records say. That's what the doctors say.

"Plaintiff had to go out and hire two doctors on the eve of trial who came here from west Los Angeles to try to tell you that plaintiff's problems were something different. But that's not the evidence in this case. That's not what the doctors are telling you.

"And the plaintiff called Mr. Mazzulla's fiancée to the stand. And when she discussed Mr. Mazzulla's problems, she repeatedly said his problems are with his lower back. His injections are with his lower back. The massages are to the lower back. This is a case about Mr. Mazzulla's complaints, if any, right now, are related to his lower back.

"And I believe he still does have those complaints. I think he's being honest when he says he has complaints in his lower back, because he has a degenerative condition. [¶] . . . . [¶]

" . . . And what was proved? You had a lot of doctors coming in here and explaining what happens with your spine. They described it as a mop. They described all the nerves that come out of the nerve roots. And when you look at those nerves, they can tell from your symptoms, they can tell from your symptoms what's going on with you.

"So if you have pain down your lower leg, pain down the front of your leg, numbness in your foot, they know why that's happening. Because the

11

nerves in your lower back are being affected. And Mr. Mazzulla's nerves in his lower back are being affected because of his injury in 2000.

"So I don't believe we're being disingenuous at all when we say what's going on with Mr. Mazzulla is happening in his lower back.

"Now, you also heard what's going on with T12. And you've heard about symptoms at T12, and if you were having symptoms at T12 you would have incontinence. You would have problems with your bowels. And you would have sexual dysfunction. Mr. Mazzulla isn't having those problems. So that's the evidence, ladies and gentlemen.

"You also . . . had an opportunity to see Mr. Mazzulla here in the courtroom, walk up to the stand. He doesn't tilt. He was also asked—he was also asked about his level of pain as he sat here through this trial, and you all heard him say, I sit there for all these hours of every day and I don't have pain. So that's the evidence in this case about what's causing the problem. [¶] . . . . [¶]

"You also have other evidence, and if you remember, Mr. Mazzulla likes to go to an event called Glamis. And I'm going to show you one of the [posts,] just to remind you as to the timeline here. This is a post, and the date of the post is in December, December 30th, 2017. This is when Glamis takes place. Mr. Mazzulla was injured on May 26th, 2017. By that December 30th, 2017, he felt well enough to be out in the desert jumping his dune buggy. [¶] . . . . [¶] . . . .

"Now, we also, in terms of a timeline, this is December 30th, 2017. Let's look at what was going on in December of 2023 and January of 2024. That's what Mr. Mazzulla was doing three months ago. You saw another video showing him driving quickly, jumping over things. I think that's what you have to consider when you look at the timeline and remembering the

12

pain that he does have. The problems that he is having when he goes into the doctors is pain to the lower back. That's what he's telling the doctors. That's what they're testing for. That's what the problem is."

O'Connor's attorney's closing argument was similar. He emphasized that, contrary to Mazzulla's testimony that he was knocked unconscious, "hospital records don't say he lost consciousness." He also noted the lack of evidence from the various facilities where Mazzulla had been treated over the years, that the jury did not "hear from a single Kaiser doctor" and that "no treating doctors [were] called to support his case."

According to the representation in Mazzulla's briefing, the jury deliberated for five days, before returning its verdict. That verdict found that both O'Connor and Eliminator were negligent, but that neither defendant's negligence was "a substantial factor in causing harm" to Mazzulla.

Judgment was apparently entered on May 8.

On May 30, Mazzulla moved for a new trial asserting that the jury verdict was improper and not supported by the evidence. The defendants filed opposition, and the motion came on for hearing on July 9. On July 12, the trial court filed its order denying it.

Mazzulla appealed.

## DISCUSSION

### The Appeal Has No Merit

As noted, Mazzulla makes two arguments on appeal, the first of which is: "A. The Court Erred By Including Inappropriate, Last Minute CACI 470 Primary Assumption of Risk Instruction and Specific Jury Questions at 2A and 4A Focused on Appellant's Assumption of Risk That Were Inapplicable and Biased and Confused the Jury." We reject the argument. But before discussing why, we begin with brief discussion of Mazzulla's assertion that

13

the assumption of risk instruction was "inappropriate, last minute," an assertion that is not only unsupported by any record reference, but is flatly contradicted by the record here. Specifically:

In the course of a lengthy discussion involving the verdict form, the trial court noted on several different occasions that defendants raised assumption of risk as an affirmative defense. Indeed, at one point the court said it was "reading" that the defendants alleged it. At another, the court remarked that "learned counsel should have known . . . going in" that assumption of risk was at issue. And O'Connor's attorney represented that he requested the jury instruction based on CACI No. 470, and argued on its inclusion when first preparing for trial.

The issue was not injected late in the game. Nor, we conclude, erroneously.

Referring to the defense in the course of the discussion on the verdict form, the trial court noted that speed-boating is "a dangerous activity. I make that specific finding." Doing so, the court noted it had read Mazzulla's opposition, including the cases on which he relied, and found them distinguishable. We discern no error.

*Truong v. Nguyen* (2007) 156 Cal.App.4th 865 (*Truong*) is persuasive. Truong was a passenger on a personal watercraft (a jet ski) who was ejected and killed after a collision with another personal watercraft. (*Id.* at p. 869.) Truong's parents sued the owner of the jet ski and his father. The trial court granted summary judgment based, as relevant here, on the conclusion that four of the parents' claims were barred by primary assumption of risk. (*Id.* at p. 874.)

The Court of Appeal affirmed, concluding that Truong's ride on the personal watercraft met the criteria for the defense because it " 'is done for

14

enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury.' " (*Truong, supra*, 156 Cal.App.4th at p. 880.) And the court went on: "It is evident from the nature of the vehicle that the activity is done for enjoyment or thrill. The vessel is open to the elements, with no hull or cabin. It is designed for high performance, speed and quick turning maneuvers. The thrill of riding the vessel is shared by both the operator and the passenger. Obstacles in the environment such as spraying water, wakes to be crossed, and other watercraft are part of the thrill of the sport, both for the operator and any passengers." (*Truong, supra*, 156 Cal.App.4th at pp. 888–889.) And then added this: "Unlike the benign activity of riding in a boat, riding a personal watercraft requires physical exertion and balance by the passenger to hold on to the operator or grips or handles on the vessel to avoid being thrown off or rolling off the craft." (*Id.* at p. 889.)

Likewise here. O'Connor's boat was a "high-performance" speed boat that could reach speeds in excess of 80 miles per hour. On the day of the incident, O'Connor had operated the boat at speeds up to 70 miles per hour and estimated he was going 45 to 50 miles per hour at the time of the incident. The instruction was applicable. (See also *Peart v. Ferro* (2004) 119 Cal.App.4th 60, 70–78 [assumption of risk applied to passenger in Sea-Doo watercraft]; *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 257 [commercial river rafting]; *Scheiner v. St. Jovite* (N.D.Cal. 1960) 180 F.Supp. 452, 454 [motorboat].)

Arguing that the instruction was error, Mazzulla relies primarily on two cases: *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792 (*Shannon*) and *Kindrich v. Long Beach Yacht Club* (2008) 167 Cal.App.4th 1252 (*Kindrich*). Neither avails him.

15

*Shannon*, which Mazzulla describes as "directly on point," is hardly that.  There, Rhodes, the owner of a boat he had acquired a few days earlier, took the Shannon family, including six-year-old Haley, out for a boat ride on a lake.  While Rhodes was driving, Haley fell out of the boat and was run over (or hit by) the boat's propeller, resulting in severe injuries to her arm.  (*Shannon*, *supra*, 92 Cal.App.4th at p. 794.)  Plaintiffs contended among other things that Rhodes negligently failed to make sure his passengers were properly seated before accelerating the boat.  (*Ibid*.)

Rhodes obtained summary judgment based on assumption of risk.  (*Shannon*, *supra*, 92 Cal.App.4th at p. 794.)  The Court of Appeal reversed, holding as follows:  "We therefore conclude, under the facts of this case, that where a driver of a boat takes passengers out on his boat for a simple ride around a lake, the nature of the activity is not one that brings it within the *Knight* [*v. Jewett* (1992) 3 Cal.4th 296] rule and therefore the doctrine of primary assumption of risk does not apply."  (*Id*. at p. 801, fn. omitted.)

This was more than a "simple ride around the lake."  As the trial court noted, in the boating context application of assumption of the risk deals with the nature of the boat itself, i.e., speedboat versus a canoe or cruise liner.  And as also noted, the court determined that the type of boating here was an inherently dangerous activity.

*Kindrich* involved a plaintiff passenger on a boat for a "burial at sea" of his father's ashes, a boat provided by defendant yacht club.  (*Kindrich*, *supra*, 167 Cal.App.4th at p. 1255.)  While disembarking, plaintiff jumped off the boat and at the moment he did it was hit by the wake from another boat, causing it to " 'go up as he stepped off the boat and when he came down onto the deck he broke his leg.' "  (*Id*. at p. 1257.)  In a two-to-one decision, the Court of Appeal reversed the summary judgment for defendant, holding that

16

plaintiff's method of disembarking did not turn his activity into an active sport and therefore was not within the doctrine of assumption of risk. (*Id.* at pp. 1262–1263.)

The facts here are a far cry. There was no error.

But even if there were, it would not assist Mazzulla, as any such error would necessarily be harmless. Article VI, section 13 of the California Constitution states: "No judgment shall be set aside, or new trial granted, in any cause, . . . or for any error as to any matter of pleading, or for any error as to matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Code of Civil Procedure section 475 is similar, stating that "The court must, in every stage of an action, disregard any error, improper ruling . . . , which . . . does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial . . . . There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

Prejudice appears where "it seems probable that the jury's verdict may have been based on the erroneous instruction." (*Robinson v. Cable* (1961) 55 Cal.2d 428, 428.) And as to a claim of instruction error, whether "the probable effect of the instruction has been to mislead the jury . . . depends on all the circumstances of the case, including the evidence and the other instructions given." (*Butigan v. Yellow Cab Co.* (1958) 49 Cal.2d 652, 660–661.) Finally, as the statute provides, "Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred." (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.)

17

Mazzulla has made no such demonstration.  Nor could he.

As the jury verdict demonstrates, the jury never reached the point of actually considering whether assumption of risk applied, finding that neither defendant's negligence was a substantial factor in causing Mazzulla's harm. In short, there is no evidence that the jury ever considered assumption of risk, much less applied it.

Mazzulla's other argument reads as follows:  "B.  The Jury Confusion and Bias Created by the Erroneous Primary Assumption of the Risk Jury Instruction and Special Verdict Form from the Trial Court Were Substantial in Prejudicial Scope and Effect and Not Merely 'Harmless.' "  Rejecting the argument requires little discussion.

It is probably enough to say that Mazzulla cites no evidence, no direct, no circumstantial, indicating that the jury was confused or biased.  Indeed, what is—perhaps, more accurately, is not—in the record supports a contrary conclusion.  As noted, the jury apparently deliberated for five days, during which time it gave no indication that it was in any way confused.  In fact, based on the reporter's transcript provided to us, the jury communicated with the court only one time, on March 21, the day after the case was in its hands. That one communication indicated that the jury had four requests of the court, three of which requested readbacks of testimony of witnesses Kamen, Terry, and Allor, and the fourth of which asked three short questions.  The trial court described the jury's request and its view of it this way:

"THE COURT:  Ian Terry—Ian Terry's complete testimony.  I'll call that 2.

"Shan Allor's complete deposition.  I'll call it 3.

"And when was the case filed?  When were the defendants served? When was the original trial dates?  I'll call that Question 4.

18

"And Ian Terry's complete testimony, yes?"

The court's initial response was that unless counsel stipulated, it would not answer the questions, and the later pages in the transcript do not reveal whether the questions were answered or not.

**A Few Closing Observations**

The above addresses the two arguments actually set forth as such in Mazzulla's brief. But scattered throughout Mazzulla's brief are various statements that, while not arguments per se, seem to assert reasons why the jury got it wrong. We thus conclude this opinion with brief comments about those statements.

Mazzulla's brief states in its "overview" that both defendants "admitted during their opening statements" that Mazzulla "was injured and harmed" during the incident. At another point the brief states that defendants "admitted during the opening statements . . . that the subject accident caused Mr. Mazzulla harm." Nothing is cited in support of the first reference; Appendix, Exhibit D, Mazzulla's motion for new trial, is cited for the second reference. This is most inappropriate.

The reporter's transcript provided us does not contain the opening statements, saying only that "opening statements were given." And as to the reference to the new trial motion, the material provided us includes a declaration of Thomas Mortimer, Jr., one of Mazzulla's attorneys, that states it includes "a true and correct copy of the opening statements." No exhibits to Mr. Mortimer's declaration are in the appendix.

Beyond that, California Rules of Court, rule 8.124(b)(3)(B) provides that an appendix must *not* contain transcripts of oral proceedings that may be designated under rule 8.130. And the accompanying notes to that rule

19

explain why.[6] O'Connor's respondent's brief referred to this, including with reference to the Rule. Mazzulla's reply brief ignores the criticism.

Prior to trial the parties entered into what Mazzulla calls a "*Howell* stipulation" (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541), concerning Mazzulla's past medical expenses. The stipulation provides in its entirety as follows: "It is hereby stipulated by and between the parties hereto: [¶] 1. Plaintiff, Nick Mazulla's past *Howell* (paid) damages as being in the amount of $55,609.46 for purposes of trial and the jury as follows: [¶] a. Kaiser—$4,497.00 [¶] b. Blue Shield—$51,112.46." (Capitalization omitted, italics added.) Mazzulla claims that the stipulation supports that defendants conceded responsibility for the claimed harm to Mazzulla. Not only does Mazzulla fail to cite any authority supporting this claim, we do not see how a stipulation as to past damages translates to a stipulation as to liability.

Mazzulla's brief has a section entitled, "D. Uncontroverted Testimony of Defense Expert Dr. Kenneth Nudelman, M.D." that begins with this statement: "Dr Nudelman agreed that Mr. Mazzulla suffered a burst fracture and compression fracture of his T-12 spine as a result of Defendants'

---

[6] "Subdivision (b)(3)(B) prohibits the inclusion in an appendix of transcripts of oral proceedings that may be made part of a reporter's transcript. . . . The prohibition is intended to prevent a party filing an appendix from evading the requirements and safeguards imposed by rule 8.130 on the process of designating and preparing a reporter's transcript, or the requirements imposed by rule 8.144(e) on the use of daily or other transcripts instead of a reporter's transcript (i.e., renumbered pages, required indexes). In addition, if an appellant were to include in its appendix a transcript of less than all the proceedings, the respondent would not learn of any need to designate additional proceedings (under rule 8.130(a)(3)) until the appellant had served its appendix with its brief, when it would be too late to designate them."

negligence and getting thrown out of the boat at speed . . . ." There follows some four pages of Dr. Nudelman's testimony, and the section concludes as follows: "This uncontroverted testimony from the defense's own neurology expert calls the jury's verdict into question and provides further factual basis that the jury was confused . . . ."

But Dr. Nudelman—who, not incidentally, was called as a neurological expert not an orthopedic expert—did not say what Mazzulla's brief represents he said. He did not say that Mazzulla's situation was the result of "defendants' negligence," but of the boating "accident" as he called it. And he never testified as to what caused the T-12 injury. In any event, whatever his testimony, the jury was free to reject it. (See Eisenberg, *supra*, ¶ 8:54 ["Uncontradicted testimony in appellant's favor does not necessarily conclusively establish the pertinent factual matter: The trier of fact is free to reject any witness'[s] uncontradicted testimony; and the court of appeal will affirm so long as the rejection was not arbitrary," italics omitted], citing *Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 170–171.)

Mazzulla's brief makes a passing reference to Code of Civil Procedure sections 657, subdivisions (1) and (7) and claims that the jury verdict was improper and not supported by the evidence under Code of Civil Procedure section 657, subdivision (6). Mazzulla does not break these statutory provisions apart, does not quote them, and does not engage in any meaningful discussion as to how these provisions apply. Moreover, section 657, subdivision (1) requires that a claim of irregularity in the proceedings must be supported by affidavits or minutes of the court. Mazzulla provides neither.

Finally, Mazzulla's brief states that O'Connor's financial condition was a factor in the jury verdict. No evidence supports the assertion.

21

**DISPOSITION**

The judgment is affirmed.  O'Connor and Eliminator shall recover their costs on appeal.

_____

RICHMAN, ACTING P. J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A172272N)

23